**ABRAHAM, FRUCHTER & TWERSKY LLP**
Jeffrey S. Abraham (JA-2946)
Jabraham@aftlaw.com
Lawrence D. Levit (LL-9507)
Llevit@aftlaw.com
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Attorneys for Plaintiff**

RECEIVED
FEB 13 2007
U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE STEIN

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL BERGER, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ALVARION LTD., ZVI SLONIMSKY, DAFNA GRUBER and MEIR BAREL, <br><br> Defendants. | Case No. **07 CV 1007** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> ECF Case <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Paul Berger, individually and on behalf of all others similarly situated, by his

undersigned attorneys, alleges the following based upon personal knowledge as to himself and his

own acts, and upon information and belief as to all other matters, based on, *inter alia*, the

investigation conducted by and through plaintiff's attorneys, which included, among other things,

a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings

by Alvarion Ltd. ("Alvarion" or the "Company") and its related entities (collectively

"Defendants"), as well as media reports about the Defendants. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

## NATURE OF THE ACTION

1.      This is a federal class action arising out of Defendants' failure to disclose material

information regarding Alvarion. This claim is brought by Plaintiff against Defendants on behalf of

a Class (defined below) consisting of all persons or entities who purchased Alvarion common

stock from November 3, 2004 through May 12, 2006, inclusive (the "Class Period").

2.      Immediately prior to the beginning of the Class Period, Defendants represented that

one of its Latin American customers (later identified as TelMex) accounted for as much as 30% of

Alvarion's total revenues, which resulted in Alvarion's realizing an unprecedented growth in

revenues. At the start of the Class Period, although the Company disclosed to investors that its

strong revenue position continued unabated, it concealed the fact that the revenue from this Latin

American customer had deteriorated, and that without this customer, it had no realistic possibility

of achieving its revenue and income numbers.

3.      Unbeknownst to investors, Defendants had falsely portrayed Alvarion's business

prospects, serving to artificially inflate the price of the Company's stock. On November 3, 2004,

the start of the Class Period, Defendants issued materially false or misleading statements that

portrayed Alvarion's outlook as robust, while they failed to disclose that it could not expect to

achieve anywhere near 30% of its revenues from TelMex, and that such loss of revenue would not

be replaced. Defendants false or misleading statements and lack of disclosure caused the price of

Alvarion's securities to be artificially inflated. The Individual Defendants (defined below) took

-2-

advantage of these inflated prices to sell shares of Alvarion stock and realize millions of dollars in proceeds.

4.       Defendants' scheme began to unravel when, on February 8, 2006, the Company announced the decline of its revenue opportunities. Following such announcement, on May 12, 2006, Defendants issued the Company's annual report, which demonstrated the lack of purchases in 2005 from its Latin American customer. As a result, the price of Alvarion shares declined dramatically, closing at $7.92 on May 12, 2006, down as much as 44% from its Class Period high of $14.22 per share on November 3, 2004.

## JURISDICTION AND VENUE

5.       The claims asserted herein arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated by the SEC. Jurisdiction is conferred by §27 of the Exchange Act and U.S.C. §1331.

6.       Venue is proper in this District pursuant to §27 of the Exchange Act. The Company's stock is listed and traded on NASDAQ, which has its corporate headquarters located in this District. Moreover, Alvarion has participated in numerous investor relations events and presentations located in this District.

7.       In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

8.       Plaintiff Paul Berger, as set forth in the accompanying certification, purchased shares of Alvarion during the Class Period and was damaged thereby.

9.       Defendant Alvarion engages in the design, development, manufacture, and

-3-

marketing of wireless products worldwide. It offers WiMAX and other wireless broadband

solutions, as well as compact cellular networks to carriers, Internet service providers, and private

network operators primarily in developing countries and remote areas. Its corporate headquarters

are located at: 21a HaBarzel Street, Tel Aviv, Israel 69710.

      10.     Defendants Zvi Slonimsky ("Slonimsky") was, at all relevant times, Chief

Executive Officer ("CEO") of Alvarion until October 2005, and a member of the Board of

Directors of Alvarion. During the Class Period, and in his role as CEO, Slonimsky reviewed and

signed Alvarion's filings the SEC.

      11.     Defendant Dafna Gruber ("Gruber") was, at all relevant times, Chief Financial

Officer ("CFO") of Alvarion. During the Class Period, and in her role as CFO, Gruber reviewed

and signed Alvarion's filings the SEC.

      12.     Defendant Meir Barel ("Barel") was, at all relevant times, Vice Chairman of the

Board of Directors of Alvarion.

      13.     The individuals named as defendants in ¶¶10-12 above are referred to herein as the

"Individual Defendants." The Individual Defendants, because of their positions with the

Company, possessed the power and authority to control the contents of Alvarion quarterly reports,

press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, i.e., the market. Each defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected. Because of their positions and access to material non-public information available to

them but not to the public, each of these defendants knew the adverse facts specified herein had

not been disclosed to and were being concealed from the public and that the positive

representations which were being made were then materially false and misleading. The Individual

Defendants are liable for the false statements pleaded herein, as those statements were each

"group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

14.    In addition to the above-described involvement, each Individual Defendant had

knowledge of Alvarion's business and its problems, and each defendant was motivated to conceal

such problems. Defendant Slonimsky as CEO, provided for financial reporting and

communications with the market. Communications with the market, including conference calls, as

well as internal reports detailing Alvarion's business progress, prospects and actual growth were

prepared under his direction. Defendant Gruber, as CFO, also provided for communications with

the market, including conference calls, as well as reports on Company operations, financing and

press releases issued by the Company.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

15.    Each defendant is liable for (a) making materially false statements, or (b) failing to

disclose materially adverse facts known to him or her about Alvarion. Defendants' fraudulent

scheme and course of business: (a) deceived the investing public regarding Alvarion's prospects

and business; (b) artificially inflated the prices of Alvarion's publicly traded securities; and (c)

caused Plaintiff and other members of the Class to purchase Alvarion's publicly traded securities

at inflated prices.

## BACKGROUND AND SUBSTANTIVE ALLEGATIONS

16.    On May 5, 2004, Defendants issued a press release entitled, "Alvarion Reports

Record Results for the First Quarter 2004 - Revenues increased 13% sequentially to a record of

$44.7 million, improvement in all financial measurements". The press release stated in part:

Tel – Aviv, Israel, May 5, 2005 – Alvarion Ltd. (NASDAQ: ALVR), the global leader in wireless broadband solutions, today announced financial results for the first quarter ended March 31, 2004.

Revenues for the first quarter of 2004 rose to a record $44.7 million, an increase of 13% compared to $39.5 million in the fourth quarter of 2003, and up 100% from $22.4 million in the first quarter of 2003. Gross margin increased for the 10th consecutive quarter, reaching 43% compared to 42% in the fourth quarter of 2003 and 39% in the first quarter of 2003.

* * *

Comments of Management

"Q1 was another quarter of growth with strong execution by our team, which enabled us to more than double our profit on a non-GAAP basis from the previous quarter," noted Zvi Slonimsky, CEO of Alvarion. "Revenues were up 13% sequentially even though Q1 tends to be a seasonally weak quarter, owing both to strong demand across the board and excellent progress on the implementation of the large Latin American project for which the company received $40M orders as announced last year. The receipt of an $18 million follow-on order for this project further attests to our performance.

* * *

Q2 2004 Guidance

The Company expects Q2 2004 revenues to range between $47 million and $49 million. At this revenues range, net earnings per share is expected to range between 3 and 4 cents, while non-GAAP net earnings per share, which excludes amortization of intangible assets and deferred stock-based compensation, is expected to range between 4 and 5 cents.

* * *

17.    On August 4, 2004, Defendants issued a press release, attesting to continuing record sales growth into 2Q04. Defendants were well aware that this unprecedented growth was the result of unusually large orders coming from a large Latin American project, sponsored by TelMex, Mexico's main telecommunications service provider. Defendants also knew that the trajectory of the Company's growth was unsustainable, as performance on the existing TelMex

contracts was nearing completion and additional contracts of this magnitude had not materialized. Nevertheless, Defendants' communications to the investment community served to artificially inflate the price of the Company's stock, while the Company's revenue opportunities were set to decline.

### Defendants False And Misleading Statements
### And Omissions During The Class Period

18.     On November 3, 2004, Defendants issued a press release entitled, "Alvarion Again Achieves Record Results for the Third Quarter of 2004 - Revenues Up 7%, Net Income Increased 47% Sequentially." The press release stated in part:

> Revenues for the third quarter of 2004 [ended September 30, 2004] rose to a record $52.2 million, an increase of 7% compared to $48.8 million in the second quarter of 2004, and up 52% from $34.3 million in the third quarter of 2003. Gross margin increased for the 12th consecutive quarter, reaching 44.3% compared to 43.2% in the second quarter of 2004 and 41.1% in the third quarter of 2003.

> According to US GAAP, net income increased to $3.7 million or $0.06 per share on a fully diluted basis for the third quarter of 2004. GAAP net income for the second quarter of 2004 was $2.5 million, or $0.04 per share on a fully diluted basis, and GAAP net loss for the third quarter of 2003 was $(2.1) million, or $(0.04) per share.

> Revenues for the first 3 quarters of 2004 totaled to $145.6 million, an increase of 66% compared with revenues of $87.7 million in the same period in 2003. During the first 3 quarters of 2004, net income totaled to $7.6 million compared to a net loss of $(11.9) million in the same period of 2003.

> Results for all periods include expenses attributable to the amortization of intangible assets and amortization of deferred stock compensation, which totaled $680,000 in the second and third quarters of 2004, and $790,000 in the third quarter of 2003. Excluding all aforementioned amortizations, the Company's non-GAAP net income for the third quarter of 2004 was $4.4 million, or $0.07 per diluted share. For the second quarter of 2004 non-GAAP net income was $3.2 million, or $0.05 per diluted share, and for the third quarter of 2003 non-GAAP net loss was $(1.3) million, or $(0.02) per share.

> The Company generated $6.3 million in cash provided by operating activities in the third quarter and the balance sheet remained very strong with its

cash position reaching a record $170 million at September 30, 2004. DSO was a record low of 35 days.

Comments of Management

"Both technological and market leadership combined with strong execution led to another outstanding quarter for the company, " said Zvi Slonimsky, CEO of Alvarion. "Once again we achieved improvement in all financial measurements.

"We are continuing to enhance our position as the leader in both broadband wireless access and the adoption of the WiMAX standard. Our broad-based growth in Q3 again reflected the increase in worldwide demand for wireless broadband solutions. We also continue to see a high degree of interest in the WiMAX standard.

* * *

"During the third quarter, we continued to see strong demand for all product groups from operators around the world. We were pleased by the follow-on orders from existing Tier 1 incumbent carriers in Latin America, Europe, South Africa, and China," continued Mr. Slonimsky. "We expect these regions to continue to be sources of strong growth going forward.

* * *

Q4 2004 Guidance

The Company expects Q4 2004 revenues to range between $54 million and $56 million. At this revenue range, net earnings per share are expected to range between 7 and 8 cents while non-GAAP net earnings per share, which excludes amortization of intangible assets and deferred stock-based compensation, is expected to range between 8 and 9 cents. The fourth quarter guidance also excludes any impact on results of operations and any one time transaction-related charges associated with the acquisition of interWAVE Communications International Ltd., which the company hopes to close by the end of Q4.

* * *

19.     On an earnings conference call on November 3, 2004, Slonimsky and Gruber were

asked if they were confident of obtaining more business from TelMex. Slonimsky responded:

"Regarding TelMex, first of all we've got an infrastructure order, which also indicates there is

going to be continued deployment of this productline going forward. We expect our growth to

come first from TelMex, west and eastern Europe, APAC and other customers all over the world

and Latin America." In a subsequent question about whether the large Latin America customer's

orders will decrease and then increase, Gruber stated: "I think it is difficult to estimate the pattern

of the order. I think year-over-year, we believe we can continue to grow our business based on

additional orders from this customer and also from other opportunities we see in front of us." A

different analyst then asked about the Latin America customer if Alvarion was "at a coverage

range in which they pretty much are 80 percent done their coverage if their customer base, or

would you characterize it as less than 50 percent?" In response, Slonimsky stated: "We have only

a small fraction of the coverage customer base. So we have a huge amount of minus (ph) to cover

going forward in the next couple of years."

      20.     On February 16, 2005, Defendants issued a press release entitled, "Alvarion

Reports Fourth Quarter and Full Year 2004 Results - Q4 Revenue Set New Record, Non-GAAP

EPS Excluding Acquisition Impact Exceeded Guidance." The press release stated in part:

> On a GAAP basis, revenue for the fourth quarter [ended December 31,
> 2004] was $55.9 million and the net loss was $(6.8) million, or $(0.12) per share.
> Fourth quarter results included $1.6 million in revenue and an operating loss of
> $(0.8) million from the inclusion of interWAVE for a 3-week period. GAAP
> results in the fourth quarter also included special charges of $11.4 million,
> comprised mainly of the write-off of interWAVE in-process research and
> development and other acquisition-related expenses.

> Strong Fourth Quarter Operating Performance

> For comparison purposes, Alvarion's non-GAAP standalone revenue
> (excluding interWAVE operations) reached a record $54.3 million in the fourth
> quarter of 2004, an increase of 4% sequentially, and up 38% over the comparable
> GAAP revenue in the fourth quarter of 2003. Non-GAAP standalone gross margin
> increased for the 13[th] consecutive quarter to 44.7%. Non-GAAP standalone EPS
> exceeded the high end of management's guidance by one cent per share. Excluding
> amortization of intangible assets and deferred stock compensation, non-GAAP
> standalone EPS was $0.10 per diluted share, compared with non-GAAP EPS of
> $0.07 per diluted share in the third quarter of 2004 and non-GAAP EPS of $0.01

-9-

per diluted share in the fourth quarter of 2003.

Commenting on the results, Zvi Slonimsky, CEO of Alvarion, said, "We are pleased to report a strong finish to an excellent year. We grew every quarter during 2004 and ended the year with $200 million in revenue from our traditional business, a 57% increase from the prior year. During 2004, the company generated an impressive $20 million in cash flow from operations and, after acquisition-related payments, we ended to year with about $133 million in cash on our balance sheet."

Summary of Full Year Results

On a GAAP basis, revenue for 2004 was $201.5 million, with a net profit of $0.9 million, or $0.01 per diluted share. Full year results included $1.6 million in revenue and an operating loss of $(0.8) million from the inclusion of interWAVE for a 3-week period. GAAP results for 2004 also included special charges of $11.4 million, comprised mainly of the write-off of interWAVE in-process research and development and other acquisition-related expenses.

For comparison purposes, Alvarion's non-GAAP standalone revenue for 2004 was $200 million, compared with GAAP revenue of $127.2 million in 2003. Excluding amortization of intangibles and deferred stock compensation, non-GAAP standalone net profit was $15.9 million, or $0.25 per diluted share, compared with a non-GAAP net loss of $(6.5) million or $(0.12) per share in 2003.

Management Review and Comments

"In addition fo strong growth, we achieved a number of important business objectives and began multiple strategic initiatives to enhance our future prospects for growth and industry leadership," continued Mr. Slonimsky.

"During the year, we dramatically increased our direct sales and proved that we can handle large projects for major operators, while also strengthening our relationships with OEM partners and distributors around the globe.

\* \* \*

Q1 2005 Guidance

The Company expects Q1 2005 revenue to range between $57 and $60 million. At this revenue range, net earnings per share are expected to range between breakeven and $0.01, while non-GAAP net earnings per share, which excludes special charges, amortization of intangible assets and deferred stock-based compensation, are expected to range between $0.03 and $0.04.

\* \* \*

21.     On May 4, 2005, Defendants issued a press release entitled, "Alvarion Reports First

Quarter 2005 Results". The press release stated in part:

> On a GAAP basis, revenue for the first quarter [ended March 31, 2005]
> reached a record of $57.2 million, up 2% sequentially from $55.9 million and up
> 28% from $44.7 million in the first quarter of 2004. Net income was $0.4 million,
> or $0.01 per share for the quarter, compared with a net loss of $6.8 million or $0.12
> cents loss per share in the fourth quarter of 2004 and net income of $1.4 million, or
> $0.02 per share in the fourth quarter of 2004. First quarter results included $0.9
> million acquisition-related expenses pertaining to the purchase of interWAVE
> Communications on December 9, 2004, as well as $1.1 million of amortization of
> intangibles and $0.5 million amortization of deferred stock compensations.
> Management indicated that any additional acquisition-related charge in Q2 will be
> minimal.

> Excluding amortizations and acquisition-related charges, on a non-GAAP
> basis, net income was $2.8 million, or $0.04 per share compared with $5.4 million,
> or $0.08 per share in the prior quarter and $2.1 million, or $0.03 per share in Q1 of
> 2004.

> Gross margin increased to 46% as a result of favorable product mix.
> Excluding amortizations and acquisition-related expenses mentioned above,
> operating expenses increased to $24.2 million or 42% of revenue, on a non-GAAP
> basis, due primarily to the inclusion of interWAVE Communications' operating
> expenses for a full quarter.

> Comments of Management

> "Our team executed very well this quarter on all major objectives -
> financial, technical, and market development," said Zvi Slonimsky, CEO of
> Alvarion. "We are meeting our targets and continue to expect revenue growth of at
> least 25% this year.

> "Demand is strong for both WiMAX and non-WiMAX solutions, and
> growth in Q1 was broad-based, coming from products for both licensed and license-
> exempt frequencies.

> * * *

> "The integration of interWAVE's business is progressing according to plan,
> and we are beginning to expand our pipeline of new opportunities. Based on this
> we continue to believe that, once we move through the normal sales cycles for this
> business, we will begin to see more traction during the second half of the year.

* * *

"It was certainly gratifying that most of the operators that participated in the Intel [WiMAX] launch event, including Altitude,Iberbanda, and Millicom, are Alvarion customers. Evaluation and trial deployment activity remains brisk, with Alvarion involved in most of the active trials around the world. The scope and duration of these trials up to this point reinforces our belief that our growth will accelerate in the second half of the year.

"We believe that we stand on the threshold of the WiMAX revolution in fixed broadband access, and we look forward to continuing to lead the market for mobile WiMAX through our collaboration with several major partners. We see a bright future for both fixed and mobile applications of this technology," concluded Mr. Slonimsky.

Guidance

The Company's revenue guidance for Q2 2005 is $53 million to $58 million. This guidance assumes no substantial contribution from additional orders related to a major customer's ongoing project due to the difficulty in predicting the precise timing of orders.

At the revenue range above, net earnings per share are expected to range between breakeven and 3 cents while non-GAAP net earnings per share, which excludes amortization of intangibles and acquisition-related charges, is expected to range between 2 and 5 cents.

* * *

22.    On July 5, 2005, the Company held an earnings conference call, during which defendant Slonimsky stated:

"During Q2 we shipped a small amount of equipment to our largest customer. Some reports have talked about this Latin American operator going away. Not true. We are talking with them about a number of projects and we feel comfortable that we understand their needs. They are happy with us and we continue to expect additional orders, although the timing remains difficult to anticipate."

23.    On August 3, 2005, Defendants issued a press release entitled, "Alvarion Reports Second Quarter 2005 Results - Final Results Confirm WiMAX Momentum". The press release stated in part:

-12-

Revenue for the second quarter [ended June 30, 2005] reached $47.0 million, down 18% sequentially from $57.2 million in the first quarter of 2005, and down 4% from $48.8 million in the second quarter of 2004. The decline in revenue resulted from lower sales to a major customer, and delayed orders and postponed revenue recognition in non-WiMAX product lines. On a GAAP basis, the lower-than-expected level of revenue caused the company to report a net loss of ($3.6) million, or ($0.06) per share. This compares with net income of $0.4 million, or $0.01 per share in Q1 and $2.5 million, or $0.04 per diluted share in the second quarter of 2004.

Excluding amortization of acquired intangibles and deferred stock compensation of an aggregate of $1.1 million and $0.7 million in the second quarter of 2005 and 2004, respectively, and amortization of intangibles and deferred stock compensation as well as acquisition related expenses totaling $2.5 million in Q1 2005, on a non-GAAP basis, Q2 net loss was ($2.5) million, or ($0.04) per share, compared with a net profit of $2.8 million, or $0.04 per diluted share in the prior quarter, and a non-GAAP net profit of $3.2 million, or $0.05 per diluted share in Q2 of 2004. . . .

Gross margin increased to a record 46.5% in Q2 of 2005 due to a favorable product mix. Excluding amortizations mentioned above, operating expenses increased slightly to $25.0 million or 53% of revenue, on a non-GAAP basis, due primarily to continued investment, mainly in research and development in connection with the cellular mobile and WiMAX initiatives.

Comments of Management

"Despite a challenging quarter, BreezeMAX revenue continued to grow in line with our original expectation and we achieved several important goals," said Zvi Slonimsky, CEO of Alvarion. "We continued to expand the number of WiMAX trials and evaluations and believe we are engaged in more WiMAX activity than any other vendor. In addition to expanded trials, in Q2 we began to see additional orders for commercial deployments of the BreezeMAX platform in several regions of the world. This is significant beyond the immediate contribution to revenue because these deployments will afford us valuable field experience that will help us maintain our market lead."

"We are on track with a number of new product introductions. In April, Alvarion was the first vendor to demonstrate a working outdoor CPE based on the Intel chip. Later in the quarter, we also demonstrated our indoor self-install CPE, also based on the Intel chip, at several industry events. We also announced the expansion of the BreezeMAX platform to include 2.3 GHz and 2.5 GHz bands for North America. In addition, we introduced enhancements to some of our non-WiMAX products including the MPOTS extension of our multi-service solution, significantly improving the price per line for carriers."

"The integration of the interWAVE business is progressing according to plan, and we are continuing to expand our pipeline of new opportunities. As these opportunities move through the normal sales cycle, we expect to see better traction and higher revenues during the second half of the year for this business."

Commenting on the quarter, Mr. Slonimsky said, "We have always expected a relatively slow first half of 2005, due to the transition of our wireless DSL products to a WiMAX standard-based platform. Our original guidance, particularly for Q2, assumed some displacement of proprietary products and longer sales cycles as customers considered moving to BreezeMAX. After a detailed analysis of actual Q2 results, we confirmed that the reasons for the revenue delays in our non-WiMAX products were indeed customer-specific, but we also identified an underlying hesitation on the part of customers for our TDM voice-oriented products. This was something we had not anticipated."

"Looking ahead to the second half of the year," Slonimsky continued, "We continue to expect growth from our wireless DSL solutions, both our current advanced products for the unlicensed bands and WiMAX-ready products in the licensed bands. However, our revised outlook assumes that this growth will be less robust than we originally expected due to longer-than-expected sales cycles and potential further delays in allocating licensed spectrum in certain key regions. Our second half expectations are also tempered by the likely continuation of weakness in TDM voice-oriented solutions as customers evaluate potential WiMAX alternatives. We continue to expect improving business momentum in our cellular mobile business in the second half of the year but, as was the case in Q2, we may not recognize revenue in the same quarter as we ship the equipment. Finally, for some of the same reasons just cited, we have excluded from our guidance any substantial revenue from a major customer that accounted for a significant amount of our revenue in 2004. We continue to believe that there is a good possibility of further orders from this customer in the second half and, therefore, we believe there is some potential upside to our revised outlook."

Third Quarter Guidance

The Company's revenue guidance for Q3 2005 is $43 million to $48 million. At this revenue range, per share results are expected to range between a loss of 6 and 10 cents per share, while the non-GAAP loss per share, which excludes amortization of intangibles and deferred stock compensation, is expected to range between 4 and 8 cents.

* * *

24.    Defendants' disclosures on November 3, 2004, February 16, 2005, May 4, 2005,

July 5, 2005 and August 3, 2005 were false or misleading because TelMex did not plan to

-14-

undertake further contracts with the Company, nor was there any reasonable prospect of sustaining

the revenue opportunity achieved during 2004 or the Company's growth rate, without relying on

its business prospects and opportunities with its TelMex customer. Defendants were aware or

consciously and recklessly disregarded these facts. It was objectively unreasonable to signal to the

investment community positive business prospects, given the reality of the inability of the

Company to sustain its growth rate, without any realistic possibility of continued, substantial

revenue opportunities from its TelMex customer.

## THE TRUTH IS REVEALED

25.    One February 8, 2006, defendants issued a shocking press release entitled,

"Alvarion Reports Fourth Quarter and Full Year 2005 Results - Resumed sequential growth;

BreezeMAX™ Leadership Continues". The press release stated in part:

> *Revenue for the fourth quarter [ended December 31, 2005] reached $46.5*
> *million, up 3% sequentially from $45.0 million in the third quarter of 2005.*
> *Revenue in Q4 2005 declined 17% from $55.9 million in the fourth quarter of*
> *2004, primarily reflecting a higher revenue contribution from one large customer*
> *during the fourth quarter of 2004.* (emphasis added)

> Gross margin was 45% in Q4 of 2005, consistent with Alvarion's target
> operating model.

> On a GAAP basis, the company reported a net loss of $(4.9) million, or
> ($0.08) per share. This compares with a net loss of $(5.5) million, or $(0.09) per
> share in Q3 and a net loss of ($6.8) million, or ($0.12) per share in the fourth
> quarter of 2004, which included charges of $11.4 million representing a write-off of
> in-process research and development and acquisition related expenses.

> Excluding amortization of acquired intangibles and deferred stock
> compensation of an aggregate of $1.1 million in the fourth and third quarters of
> 2005, and $0.8 million in the fourth quarter of 2004 as well as acquisition-related
> charges of $11.4 million in the fourth quarter of 2004, on a non-GAAP basis, Q4
> 2005 net loss was ($3.8) million, or ($0.06) per share, compared with a net loss of
> ($4.4) million, or ($0.07) per share in the third quarter of 2005, and a non-GAAP
> net profit of $5.4 million, or $0.08 per diluted share in Q4 of 2004. See the
> attached table showing the reconciliation of GAAP to non-GAAP figures.

-15-

*Revenue for 2005 was $195.7 million compared with $201.5 million in 2004. Taking into account a very large deployment by Alvarion's largest customer in 2004, revenues from Broadband Wireless Access solutions, including BreezeMAX, Alvarion's flagship WiMAX platform, increased by 20% in 2005 over 2004.* (emphasis added)

On a GAAP basis, the company reported a net loss of ($13.6) million, or ($0.23) per share in 2005. This compares with a net income of $0.9 million, or $0.01 per share in 2004.

Excluding amortization of acquired intangibles and deferred stock compensation of an aggregate of $4.9 million and $2.8 million in 2005 and 2004, respectively, as well as acquisition-related charges of $0.9 million and $0.4 million in 2005 and 2004, respectively, and $11 million of in-process research and development write-off in 2004, on a non-GAAP basis, 2005 net loss was ($7.8) million, or ($0.13) per share, compared with a net income of $15.1 million, or $0.24 per share in the prior year. . . .

Comments of Management

"We are pleased that we resumed sequential growth in Q4," said Tzvika Friedman, CEO and President of Alvarion. "Broadband wireless access revenue increased for both WiMAX and non-WiMAX based solutions in Q4.

"We were particularly gratified by the continued strong performance of our BreezeMAX product, which increased to about $10 million in revenue in Q4. Our fundamental business, primarily wireless DSL solutions, is performing well during the transition to WiMAX and should continue to be the main engine for growth in 2006. We have strengthened our position with some of the carriers we refer to as "innovative challengers" because they are early adopters of new technology, and we expect the overall upward trend to continue.

"Other significant developments in Q4 included the successful launch of the largest ever project for our cellular mobile unit, complete networks for the islands of Guadeloupe and Martinique by Outremer Telecom. We believe this will be an important reference account that will help us land more large orders for the cellular mobile unit. In addition, a major Latin American customer has placed an initial $7 million order under a new frame agreement that could be worth up to $15 million, covering both BreezeMAX™ and eMGW™ products for several countries in Latin America.

"The fixed broadband wireless access market – both WiMAX and non-WiMAX – will be an important and growing market for the next several years," continued Mr. Friedman. "We continue to dominate the BWA market where we retain a 30% market share. Our leading position is evidence of our customers'

-16-

satisfaction with our superior product offering and support.

"We continue to invest in building our company to be a major player in the growing WiMAX market for fixed, nomadic and mobile applications. We are focusing our investment on aggressively expanding our family of WiMAX solutions to include additional frequencies, additional marketing activities with Tier 1 carriers, mobile WiMAX development, affording our customers a smooth migration path to the recently ratified 802.16e standard, and development to enable an array of new services.

"While we continue our focus on retaining our leadership on this market, we will also pursue out commitment to realizing the vision of personal broadband to enhance lifestyles and improve productivity with our mobile WiMAX solutions. Moving true broadband from an entirely facilities-based offering to one that is an 'anytime, anywhere' personal offering will create a host of new opportunities in the telecom ecosystem. We are positioning Alvarion to be the partner of choice for operators, both new and incumbent, technology partners, and systems integrators as the market evolves."

Q1 Guidance

The Company's revenue guidance for Q1 2006 is $46 million to $51 million. At this revenue range, non-GAAP per share results are expected to range between a loss of 3 and 6 cents per share. This guidance excludes expenses related to amortization of acquired intangibles and estimated recurring quarterly stock option expenses resulting from the adoption of SFAS 123R. Also excluded from non-GAAP guidance is a one-time positive cumulative effect of a change in accounting principle under SFAS 123R which cannot be quantified at this time. Since it is too early to indicate the impact of this one-time positive cumulative effect, the company will not provide GAAP earnings per share guidance.

\* \* \*

26.     The shocking news of the Company's 17% revenue decline during 4Q05 coupled with declining annualized revenues caused the price of Alvarion stock to fall $0.88 or 8.1%, to close on February 8, 2006 at a price $9.95 per share, on volume of 2.0 million shares. The stock continued to decline during the next few days on high trading volume, and closed at $9.37 per share on February 10, 2006, a 13.5% decline from February 8th, after trading as low as $9.04 per share on February 10th.

-17-

27.    Finally, on May 12, 2006, defendants filed their Annual Report on SEC Form 20-F.

The filing dubiously stated in part:

> Wireless broadband sales in 2005 were approximately $176.9 million, a
> decrease of approximately 11.5% compared with sales of approximately $199.9
> million in 2004. In 2004 and 2005, 30.6% and 5.2% of our sales were to a Latin
> American operator, respectively. *For 2005, sales to our Latin American customer
> decreased significantly due to the nearing completion of a large project. Partly as
> a result, our revenue decreased in 2005.* Excluding the impact of the large
> customer, wireless broadband sales increased approximately 20% in 2005
> compared with 2004, reflecting broad-based demand for wireless broadband
> solutions, including the BreezeMAX product, our WiMAX based platform. Sales
> in Europe, Middle East and Africa reached 58% of our BWA sales in 2005
> reflecting an increase of 30% over 2004 sales in this region, attributed mainly to the
> progress in the spectrum allocation process and the early adoption of our broadband
> wireless products by well-capitalized independent operators. Sales in Central and
> Latin America accounted for 19% of our BWA sales in 2005 a decrease of 58% (in
> dollar value) over 2004 in this region, related mainly to the decrease in deployment
> of a single large customer. During 2003 we received a large order from a Latin
> American customer. Initial deployment of this order began in 2003 and the majority
> was deployed during 2004, with the remainder in 2005. Toward the end of 2005 we
> received a small additional order from this customer, to be deployed in 2006. If we
> lose large customers we may not succeed in replacing them and our revenues will
> be adversely affected. (emphasis added)

* * *

28.    Despite this disclosure, investors had finally learned the truth – that revenue and

sales from TelMex, the Latin American operator accounting for 30.6% of the Company's sales in

2004, *had already evaporated*. Moreover, despite the fact that the Company sought to actively

conceal the evaporation of this substantial source of revenues, *investors were now fully aware that*

*these dramatic sales declines were fully reflected in the Company's revenue and income*

*numbers for the 2005 fiscal year.*

29.    The approximate 13.5% decline in Alvarion's stock price during the week of

February 8, 2006 was the direct result of the nature and extent of defendants' fraud finally being

revealed to investors in the market. The timing and magnitude of Alvarion's stock price declines

-18-

negates any inference that the loss suffered by plaintiff and other Class members was caused by
changed market conditions, macroeconomic or industry factors or Company-specific facts
unrelated to the defendants' fraudulent conduct. While the approximate 13.5 % decline in
Alvarion's stock price occurred as defendants' fraud was being revealed, the Standard and Poor's
500 securities index was flat.

30.     On May 12, 2006, the end of the Class Period, the price of Alvarion shares was
$7.92 per share, off by as much as 44% from its Class Period high of $14.22 per share on
November 3, 2004. The economic loss, i.e., damages, suffered by plaintiff and other members of
the Class were a direct result of defendants' fraudulent scheme to artificially inflate Alvarion's
stock price and the subsequent significant decline in value of Alvarion's shares when defendants'
prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

31.     At all relevant times, the market for Alvarion was an efficient market, for the
following reasons, among others:

(a)     Alvarion met the requirements for listing, and was listed and actively traded
on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, defendants filed periodic public reports with the SEC;
and

(c)     Defendants regularly communicated with public investors via established
market communications mechanisms, including through regular disseminations of press releases
on the national circuits of major newswire services and through other wide-ranging public
disclosures, such as communications with the financial press and other similar reporting services.

32.     As a result of the foregoing, the market for the securities of Alvarion promptly digested current information regarding Alvarion from all publicly available sources and reflected such information in stock prices of Alvarion. Under these circumstances, all persons who purchased or acquired the securities of Alvarion during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

33.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by executive officer(s) of defendants who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Alvarion publicly traded securities on the open market during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members

-20-

of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the defendants have or had a controlling interest.

35.    The members of the Class are so numerous that joinder of all members in impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Alvarion had more than 61 million shares of stock outstanding, owned by hundreds if not thousands of persons.

36.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and/or misleading;

(e)    Whether the prices of Alvarion's publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measures of damages.

37.    Plaintiff's claims are typical of the claims of the other members of the Class because all members of the Class are similarly affected by Defendants' wrongful conduct.

38.    Plaintiff will adequately protect the interests of the members of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests

which conflict with those of the Class.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

40.    Plaintiff incorporates by reference the above paragraphs, as if fully rewritten herein.

41.    During the Class Period, defendants disseminated, approved or deliberately disregarded the false statements specified above, which they knew or should have known were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

42.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of publicly traded Alvarion securities during the Class Period.

43.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

-22-

the market, they paid artificially inflated prices for Alvarion publicly traded securities. Plaintiff

and the Class would not have purchased Alvarion publicly traded securities at the prices they paid,

or at all, if they had been aware that the market prices had been artificially and falsely inflated by

defendants' misleading statements.

44.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their purchases of Alvarion

publicly traded securities during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against The Individual Defendants

44.    Plaintiff incorporates by reference the above paragraphs as if fully rewritten here.

45.    The Individual Defendants acted as controlling persons of Alvarion within the

meaning of §20(a) of the Exchange Act. By reason of their positions as officers and/or directors of

Alvarion and their ownership of Alvarion stock, the Individual Defendants had the power and

authority to cause Alvarion to engage in the wrongful conduct complained of herein.

46.    As set forth above, Alvarion and the Individual Defendants violated Section 10(b0

of the Exchange Act and Rule 10b-5 by their acts and omissions. As a direct and proximate result

of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages

in connection with their purchases of the Company's securities during the Class Period. By

reasons of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange

Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement as follows:

(a)  Declaring this action to be a proper class action pursuant to FRCP 23, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under FRCP 23 and appointing Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of their wrongdoing, including interest thereon;

(c)  Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all causes of action so triable.

Dated: February 13, 2007

Respectfully submitted,

*[signature]*

ABRAHAM FRUCHTER & TWERSKY LLP
Jeffrey S. Abraham (JA-2946)
Lawrence D. Levit (LL-9507)
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Counsel for Plaintiff**

-24-