# Exhibit B

GLANCY & BINKOW LLP
LIONEL Z. GLANCY, ESQ. #134180
ANDY SOHRN, ESQ. #241388
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Tel: (310) 201-9150
Fax: (310) 201-9160

LAW OFFICES OF JACOB SABO
JACOB SABO
The Tower No. 3 Daniel Frisch St. 15th Floor
Tel Aviv, Israel 64731
Tel: 011 972 3 607 88 88
Fax: 011 972 3 607 88 89

*Attorneys for Plaintiff Amnon Meir*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AMNON MEIR, On Behalf of Himself and All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>                    vs.<br><br>ALVARION LTD., ZVI SLONIMSKY, DAFNA GRUBER, MEIR BAREL,<br><br>                                    Defendants. | Case No. C 07 0374 JSW<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

        Plaintiff Amnon Meir, alleges the following upon personal knowledge as to his own acts, and upon information and belief, based upon the investigation of counsel, as to all other matters. The investigation includes the thorough review and analysis of public statements, publicly filed documents of Alvarion Ltd. (hereinafter "Alvarion" or "the Company"), press releases, news articles and the review and analysis of accounting rules and related literature.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1. Plaintiff brings this action individually and on behalf of a class of all other similarly situated public investors ("the Class") who purchased Alvarion common stock between the dates of November 3, 2004 and May 12, 2006, inclusive ("the Class Period").

2. Alvarion is an Israeli corporation headquartered in Tel Aviv, Israel. Alvarion provides wireless broadband connectivity solutions and specialized cellular networks.

3. Throughout 2004, Alvarion experienced unprecedented growth in revenues based primarily on the large contract orders of a large Latin American customer called Telmex. For most of 2004, Telmex's contract orders comprised approximately *30%* of Alvarion's revenues. In comparison, Alvarion did not have any other single customer contributing even 10% of its revenues.

4. However, as 2004 progressed, Telmex did not make subsequent contract orders with Alvarion in the same magnitude to contribute anywhere near one-third of all of Alvarion's revenues. By late 2004, Alvarion knew that revenues from existing Telmex orders were almost fully realized, and that the growth of revenue experienced in 2004 was unsustainable in the future.

5. Knowing of the inevitable slow down in revenue growth that would be caused by the lack of large orders from Telmex, on November 3, 2004 – the beginning of the Class Period – Alvarion issued materially false and misleading statements, concealing the true state of Telmex's business with Alvarion and portraying Alvarion's outlook as robust, in order to artificially inflate the price of Alvarion stock long enough to allow insiders to dump their shares and profit handsomely. Through a press release and a conference call, Alvarion made false and misleading statements, *inter alia*, regarding the business prospects and the continued success of Alvarion based on large orders from Telmex.

6. The defendants here knew – or were deliberately reckless in not knowing – that the statements regarding Telmex were false, and took advantage of the artificially inflated stock price of Alvarion, as the market had immediately reacted favorably to the November 3, 2004 fraudulent statements. Within only six days of issuing these false and misleading statements, the

1  defendants began massive sell-offs of their Alvarion shares, resulting in millions of dollars in

2  proceeds.

3         7.     Soon thereafter, the concealed truth of Telmex's lack of orders with Alvarion

4  slowly emerged, as analysts began to question whether Telmex could continue to provide the

5  same revenues as before, and as Alvarion began to post declining financial figures. However, as

6  the true state of its financial condition leaked into the market, Alvarion continued to reassure

7  investors and continued to issue false and misleading statements regarding Telmex and

8  Alvarion's financial situation.

9         8.     Finally, on May 10, 2006, Alvarion issued its Form 20-F for 2005 confirming that

10  the cause of Alvarion's declining growth rate was the lack of purchases from its sole substantial

11  customer Telmex. Throughout the Class Period, Plaintiff and Class members purchased shares

12  of Alvarion at artificially inflated prices, and were damaged as the truth regarding Telmex's

13  orders – fraudulently concealed by the defendants – emerged and the market price of Alvarion

14  shares declined thereby.

15                         **JURISDICTION AND VENUE**

16         9.     The claims asserted arise under §§10(b) and 20(a) of the Securities

17  Exchange Act of 1934 (the "Exchange Act"). Jurisdiction is conferred by §27 of the Exchange

18  Act. Venue is proper pursuant to §27 of the Exchange Act as defendant Alvarion and/or the

19  individual defendants conduct business in and the wrongful conduct took place in this District.

20                             **THE PARTIES**

21         10.     Plaintiff, Amnon Meir, as reflected in his certification accompanying hereto and

22  incorporated by reference herein, purchased Alvarion common stock at artificially inflated prices

23  during the Class Period and was damaged when Alvarion's stock price dropped as a result of the

24  defendants' conduct as alleged herein.

25         11.     Defendant Zvi Slonimsky served as Alvarion's Chief Executive Officer from

26  2002 to October 2005, and has been a member of Alvarion's board of directors from August

27  2001 to the present. Slonimsky authorized several of Alvarion's filings with United States

28  Securities and Exchange Commission ("SEC") throughout the Class Period.

1      12.     Defendant Dafna Gruber has served as the Alvarion's Chief Financial Officer

2    since 1997, and reported Alvarion's quarterly and annual financial results to the market

3    throughout the Class Period.  In addition, several of Alvarion's Class Period filings with the SEC

4    bear her imprimatur..

5      13.     Defendant Meir Barel has served as vice chairman of Alvarion's board of

6    directors since August 2001.

7      14.     Defendant Alvarion is an Israeli corporation headquartered in Tel Aviv, Israel.

8    Alvarion, Inc., a Delaware corporation located in Mountain View, California, is a wholly owned

9    subsidiary of Alvarion.  Alvarion's common stock is, and at all relevant times has been, held and

10   publicly traded on the open market.  Its common stock is listed on the Nasdaq National Market

11   ("NASDAQ").

12     15.     The parties listed in paragraphs 11-14 are referred to collectively as "Defendants."

13   The parties listed in paragraphs 11-13 are referred to collectively as the "Individual Defendants."

14   It is appropriate to treat the Individual Defendants as a group for pleading purposes and to

15   presume that the false, misleading and incomplete information conveyed in the Company's public

16   filings, press releases and other publications as alleged herein are the collective actions of the

17   narrowly defined group of defendants identified above. Each of the above officers and directors

18   of Alvarion, by virtue of their high-level positions with the Company, directly participated in the

19   management of the Company, was directly involved in the day-to-day operations of the Company

20   at the highest levels and was privy to confidential proprietary information concerning the

21   Company and its business, operations, growth, financial statements and financial condition, as

22   alleged herein. Said defendants were involved in drafting, producing, reviewing and/or

23   disseminating the false and misleading statements and information alleged herein, were aware or

24   recklessly disregarded that the false and misleading statements were being issued regarding the

25   Company, and approved or ratified these statements in violation of the federal securities laws.

26

27

28

## ALVARION ENJOYS RECORD GROWTH IN 2004 DUE TO SALES
## TO ITS LARGE CUSTOMER TELMEX

16.     Throughout 2004, Alvarion experience record growth in sales, due primarily to its sales to Telmex, its single largest customer.

17.     In a press release dated May 5, 2004, Alvarion reported "record results for the first quarter of 2004" owing largely to "the implementation of the large Latin American project [Telmex] for which the company received $40M orders as announced last year."

18.     In a press release dated August 4, 2004, Alvarion similarly reported "record results for the second quarter of 2004."

19.     As the driving force behind Alvarion's record growth was its large contract orders to Telmex, Defendants knew that the 2004 growth rate was unsustainable given the lack of additional orders from Telmex.  As the existing Telmex contracts were nearing full completion, the Defendants set the stage to artificially pump up and prop up the price of Alvarion shares in order to dump their Alvarion shares before the public could know about the impending decline in Alvarion growth.

## THE NOVEMBER 3, 2004 MATERIALLY FALSE STATEMENTS

20.     On November 3, 2004, Alvarion issued a press release reporting its financial results for the third quarter of 2004:

### ALVARION AGAIN ACHIEVES RECORD RESULTS
### FOR THE THIRD QUARTER OF 2004

Revenues Up 7%, Net Income Increased 47% Sequentially

TEL AVIV, Israel--Nov. 3, 2004--Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced financial results for the third quarter ended September 30, 2004.

Revenues for the third quarter of 2004 rose to a record $52.2 million, an increase of 7% compared to $48.8 million in the second quarter of 2004, and up 52% from $34.3 million in the third quarter of 2003. Gross margin increased for the 12th consecutive quarter, reaching 44.3% compared to 43.2% in the second quarter of 2004 and 41.1% in the third quarter of 2003.

According to US GAAP, net income increased to $3.7 million or $0.06 per share on a fully diluted basis for the third quarter of 2004. GAAP net income for the second quarter of 2004 was $2.5 million, or $0.04 per share on a fully diluted basis, and GAAP net loss for the third quarter of 2003 was $(2.1) million, or $(0.04) per share.

Revenues for the first 3 quarters of 2004 totaled to $145.6 million, an increase of 66% compared with revenues of $87.7 million in the same period in 2003. During the first 3 quarters of 2004, net income totaled to $7.6 million compared to a net loss of $(11.9) million in the same period of 2003.

Results for all periods include expenses attributable to the amortization of intangible assets and amortization of deferred stock compensation, which totaled $680,000 in the second and third quarters of 2004, and $790,000 in the third quarter of 2003. Excluding all aforementioned amortizations, the Company's non-GAAP net income for the third quarter of 2004 was $4.4 million, or $0.07 per diluted share. For the second quarter of 2004 non-GAAP net income was $3.2 million, or $0.05 per diluted share, and for the third quarter of 2003 non-GAAP net loss was $(1.3) million, or $(0.02) per share.

The Company generated $6.3 million in cash provided by operating activities in the third quarter and the balance sheet remained very strong with its cash position reaching a record $170 million at September 30, 2004. DSO was a record low of 35 days.

Comments of Management

"Both technological and market leadership combined with strong execution led to another outstanding quarter for the company," said Zvi Slonimsky, CEO of Alvarion. "Once again we achieved improvement in all financial measurements.

"We are continuing to enhance our position as the leader in both broadband wireless access and the adoption of the WiMAX standard. Our broad-based growth in Q3 again reflected the increase in worldwide demand for wireless broadband solutions. We also continue to see a high degree of interest in the WiMAX standard. We were extremely gratified by the outstanding customer response to the BreezeMAX 3500, our new WiMAX-ready system. Exemplifying the strong response were two new BreezeMAX customers announced recently - Altitude Telecom, an independent operator in France planning a nationwide WiMAX network, and MobileCity, which is deploying the first WiMAX-ready network in Scandinavia. During Q3, we received the first sample chips from Intel for the standard CPE. We are pleased with the progress that Intel is making and we are on track for having an Intel-based CPE in the market by mid-year 2005.

"During the third quarter, we continued to see strong demand for all product groups from operators around the world. We were pleased by the follow-on orders from existing Tier 1 incumbent carriers in Latin America, Europe, South Africa, and China," continued Mr. Slonimsky. "We expect these regions to continue to be sources of strong growth going forward. On October 16, 2004, we amended the amalgamation agreement with interWAVE Communications International Ltd., a leading supplier of compact cellular network infrastructure based on GSM and CDMA2000 technology that is particularly well-suited for rural areas in developing regions. We are currently awaiting approval of the deal by interWAVE shareholders and, once completed, this acquisition will complement our existing wireless solutions with a cost effective fixed and mobile solution to serve the need for voice and data in regions of the world that need telecommunication infrastructure. We intend to apply our experience in integrating acquisitions to realize the benefits of the combined company," concluded Mr. Slonimsky.

1    Q4 2004 Guidance

2    The Company expects Q4 2004 revenues to range between $54 million and $56
     million. At this revenue range, net earnings per share are expected to range
3    between 7 and 8 cents while non-GAAP net earnings per share, which excludes
     amortization of intangible assets and deferred stock-based compensation, is
4    expected to range between 8 and 9 cents. The fourth quarter guidance also
     excludes any impact on results of operations and any one time
5    transaction-related charges associated with the acquisition of interWAVE
     Communications International Ltd., which the company hopes to close by the end
6    of Q4.

7        21.    The press release was materially false and/or misleading because Telmex –

8    whose purchases in 2004 constituted about 30% of Alvarion's revenues – was not planning to

9    make, nor did it discuss with Alvarion, additional orders that would provide any substantial

10   revenue for Alvarion during 2005, and Alvarion could not sustain its growth rate without

11   Telmex's substantial business..

12       22.    Defendants knew or were deliberately reckless in not knowing (a) that Telmex

13   was not planning to make additional orders, (b) that there was no basis to believe that Telmex

14   – Alvarion's single largest customer by far – would continue to provide substantial revenues

15   in 2005, and (c) that Alvarion could not sustain its growth rate without the substantial

16   revenue contribution from Telmex purchases.

17       23.    On a November 3, 2004 Alvarion Earnings Conference Call, Defendant

18   Slonimsky stated:

19           a.    "Our revenue for the first nine months were up 66 percent from the

20   corresponding period last year.  With the major improvements in profitability from a

21   non-GAAP operating growth of $11 million to a non-GAAP growth (indiscernible) of

22   7 million in the first three quarters of 2004.  We attribute this excellent performance

23   to improving demand in the market, we have strengthened our technology and market

24   position and most important of all outstanding execution by the entire Alvarion

25   team."

26           b.    "Regarding Telmex, first of all we've got an infrastructure order,

27   which also indicates there is going to be continued deployment of this product line

28   going forward.  We expect our growth to come first from Telmex, west and eastern

─────────────────────────────────────────────
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Europe, APAC and other customers all over the world and Latin America." Alvarion "expect[s] additional follow on orders [from Telmex]."

    c.     "During Q3 with a (indiscernible) product still on order from our largest customer in Latin America [Telmex], and we expect additional follow on orders in the future."

    d.     "[T]his large Latin America customer [Telmex] continued to put all the results, the last order of infrastructure is giving us visibility of a large amount of future sales in this region. So we don't expect hiccups going forward."

24.    On the same November 3, 2004 Alvarion Earnings Conference Call, Defendant Dafna Gruber also stated:

    a.     "Once again we are reporting record results for Q3. Revenues reached $52.2 million, an increase of 7 percent sequentially and 52 percent year-over-year reflecting continuous broad-based growth. Our geographic breakdown of revenues were as follows. As expected, central and Latin America was particularly strong accounting for 45 percent of revenues compared with about the same in Q2. . . . Our gross margin reached 44.3 percent compared with 43.2 in Q2 continuing to move closer to our 45 percent target gross margin leverage. Q3 was the 12th consecutive quarter of gross margin improvement. Operating expenses declined to 39 percent of revenues from 40 percent in Q2."

    b.     With regard to the timing of revenue recognition from Telmex orders: "We are going to benefit from previous orders we received during this quarter and the first quarter of '05 and some of them in the second quarter of '05."

    c.     "I think year-over-year, we believe we can continue to grow our business based on additional orders from [Telmex] and also from other opportunities we see in front of us."

25.    The statements made by Defendants Slonimsky and Gruber in the November 3, 2004 conference call were materially false and/or misleading because Telmex – whose purchases in 2004 constituted about 30% of Alvarion's revenues – was not planning to make,

1    nor did it discuss with Alvarion, additional orders that would provide any substantial revenue
2    for Alvarion during 2005.

3        26.    Defendants Slonimsky and Gruber knew or were deliberately reckless in not
4    knowing (a) that Telmex was not planning to make additional orders, (b) that there was no
5    basis to believe that Telmex – Alvarion's single largest customer by far – would continue to
6    provide substantial revenues in 2005, and (c) that Alvarion could not sustain its growth rate
7    without the substantial 30% revenue contribution from Telmex purchases.

8        27.    The market reacted favorably to the materially misleading statements made by
9    Defendants in the November 3, 2004 Press Release and Alvarion Earnings Conference Call.
10    The stock price jumped 12.7% that day to close at $14.22 per share, and only 9 days later,
11    closed at $15.39 per share.

12    **THE DEFENDANTS ENGAGE IN MASSIVE INSIDER SALES OF ALVARION**
13    **STOCK SHORTLY FOLLOWING THE NOVEMBER 2004 FALSE STATEMENTS**

14        28.    The Defendants, aware of the impending slowing of Alvarion growth
15    attributable to Telmex, took advantage of the artificially inflated price of Alvarion stock and
16    engaged in massive sales of Alvarion stock in November 2004.  The Defendants began
17    selling Alvarion stock on November 9, 2004, *a mere six days following the false and*
18    *misleading press release and conference call issued by Defendants on November 3, 2004*.

19        29.    In the month of November, Defendants sold millions of Alvarion shares,
20    pocketing millions of dollars in proceeds.  The large amount of insider sales as well as the
21    temporal proximity of these sales to the false and misleading statements issued on November
22    3, 2004 provide additional evidence of Defendants' scienter, revealing Defendants' scheme to
23    artificially inflate the price of Alvarion stock long enough to sell high on their own shares.

24    **THE TRUTH BEGINS TO EMERGE AS THE TELMEX PROBLEM**
       **MATERIALIZES**

25        30.    On January 19, 2005, the truth regarding Telmex purchases and Alvarion's
26    growth rate first began to emerge, as Kevin Dede – an analyst for Merriman Curhan Ford &
27    Co. – expressed sharp skepticism of Telmex's continued purchases in a report:

28

**Key Latin American Customer.** Visibility into the business Alvarion has with its 30% customer in Latin America is vastly reduced relative to the same time last year. Between September 9 and November 6, 2003, Alvarion had issued two press releases indicating orders received from this Latin American customer totaled $40 million for Alvarion's eMGW broadband wireless product. On April 14, Alvarion received an additional follow-on order for $18 million and on October 4, 2004, a $6 million order for the beginning of the second phase of this key customer's deployment for a grand total of $64 million in orders. We estimate that Alvarion has shipped roughly $80 million to Latin America during 2004, about $16 million beyond what the important single customer has ordered in total.

In 2003, Alvarion shipped $18.7 million worth of product to Mexico or 14.7% of sales, up from $0.9 million or 1.0% of sales in 2002. If we assume that this single key customer is responsible for the majority of the increase of business in Mexico, we can assume that Alvarion shipped about $18 million in 2003 to this customer. Chile has been the other major destination for Avarion's equipment in Latin American [sic], and if we were to assume that business there increased about 20% in 2004 to roughly $5 million, we estimate that the key Mexican customer received approximately $75 million worth of product in 2004. We think this estimate is likely high, but makes the point that of the $64 million in placed orders, the majority ($19 million in 2003 and close to $75 million in 2004) if not the entirety has been shipped, deployed, and recognized as revenue. On the September quarter conference call, management noted that the company didn't expect to see typical seasonal slowness in the March 2005 quarter, primarily as a result of continued strong business with this key customer. While common sense leads us to believe that business with this key customer won't disappear altogether, we do not believe business can maintain 2004 growth levels ($19 million in 2003 to approximately $75 million in 2004), given we have seen no announcements of follow-on orders since October 4 last year.

31. The market reacted quickly to Dede's analyst report, and the stock price of Alvarion dropped 13% that day to close at $10.71 per share amid heavy trading.

32. On February 16, 2005, Alvarion issued a press release reporting its financial results for the fourth quarter and year ended 2004:

### ALVARION REPORTS FOURTH QUARTER AND
### FULL YEAR 2004 RESULTS

- Q4 Revenue Set New Record
- Non GAAP EPS Excluding Acquisition Impact Exceeded Guidance

TEL AVIV, Israel--February 16, 2005 -- Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced financial results for the fourth quarter and year ended December 31, 2004. Both periods include the operating results of interWAVE Communications Ltd (interWAVE) from the date of acquisition, December 9, 2004.

On a GAAP basis, revenue for the fourth quarter was $55.9 million and the net loss was $(6.8) million, or $(0.12) per share. Fourth quarter results included $1.6 million in revenue and an operating loss of $(0.8) million from the inclusion of interWAVE for a 3-week period. GAAP results in the fourth quarter also included special charges of $11.4 million, comprised mainly of the

1   write-off of interWAVE in-process research and development and other
2   acquisition-related expenses.

3   Strong Fourth Quarter Operating Performance

4   For comparison purposes, Alvarion's non-GAAP standalone revenue (excluding
    interWAVE operations) reached a record $54.3 million in the fourth quarter of
    2004, an increase of 4% sequentially, and up 38% over the comparable GAAP
5   revenue in the fourth quarter of 2003. Non-GAAP standalone gross margin
    increased for the 13th consecutive quarter to 44.7%. Non-GAAP standalone EPS
6   exceeded the high end of management's guidance by one cent per share. Excluding
    amortization of intangible assets and deferred stock compensation, non-GAAP
7   standalone EPS was $0.10 per diluted share, compared with non-GAAP EPS of $0.07
    per diluted share in the third quarter of 2004 and non-GAAP EPS of $0.01 per diluted
8   share in the fourth quarter of 2003.

9   Commenting on the results, Zvi Slonimsky, CEO of Alvarion, said, "We are pleased
    to report a strong finish to an excellent year. We grew every quarter during
10  2004 and ended the year with $200 million in revenue from our traditional
    business, a 57% increase from the prior year. During 2004, the company generated
11  an impressive $20 million in cash flow from operations and, after
    acquisition-related payments, we ended the year with about $133 million in cash
12  on our balance sheet."

13  Summary of Full Year Results

14  On a GAAP basis, revenue for 2004 was $201.5 million, with a net profit of $0.9
    million, or $0.01 per diluted share. Full year results included $1.6 million in
15  revenue and an operating loss of $(0.8) million from the inclusion of interWAVE
    for a 3-week period. GAAP results for 2004 also included special charges of
16  $11.4 million, comprised mainly of the write-off of interWAVE in-process
    research and development and other acquisition-related expenses.

17
    For comparison purposes, Alvarion's non-GAAP standalone revenue for 2004 was
18  $200 million, compared with GAAP revenue of $127.2 million in 2003. Excluding
    amortization of intangibles and deferred stock compensation, non-GAAP standalone
19  net profit was $15.9 million, or $0.25 per diluted share, compared with a
    non-GAAP net loss of $(6.5) million or $(0.12) per share in 2003.
20
    Management Review and Comments
21
22  "In addition to strong growth, we achieved a number of important business
    objectives and began multiple strategic initiatives to enhance our future
    prospects for growth and industry leadership," continued Mr. Slonimsky.
23
24  "During the year, we dramatically increased our direct sales and proved that we
    can handle large projects for major operators, while also strengthening our
25  relationships with OEM partners and distributors around the globe. Recently, we
    expanded our existing OEM relationships with Siemens and Alcatel to include our
26  BreezeMAX product and signed a new WiMAX OEM agreement with Lucent as well.

27  "In June, we introduced BreezeMAX 3500, which made us the first vendor to market
    a WiMAX-ready product. We are gratified by the strong interest in WiMAX from
    every type of customer, both incumbent and alternative carriers as well as both
28  fixed and mobile operators. We have about 50 installations of our WiMAX-ready

solution - either as commercial deployments or in various stages of trial activity. Operators that already have commercial deployments of our WiMAX-ready solutions include, among others, Iberbanda in Spain, Altitude in France and MobileCity in Scandinavia. This points to Alvarion as the vendor of choice for future WiMAX solutions, and we believe that this high level of interest will be converted into revenue mostly beginning in the second half of 2005.

"We are executing well on our product plans and continue to expect to be introducing an Intel-based WiMAX CPE by mid-year. We plan to expand into the mobile broadband arena next year via two strategic moves. First was the acquisition of the interWAVE cellular mobile business in December. We've added products that support compact GSM and CDMA cellular network deployments and network extensions in hard to reach areas such as rural portion of developing regions, as well as compact cellular networks for specialty applications such as homeland security, disaster relief and travel and leisure. The new CDMA technology complements our existing voice and data capabilities in developing regions. We are pleased that the integration process is moving smoothly and according to our plans.

"The second strategic move was the formation of a new business unit to focus on developing a mobile WiMAX solution to be launched next year. The new mobile WiMAX business unit will draw on the technology and experience from both the fixed BWA and cellular businesses to accelerate development.

"Owing to our strong financial condition and experienced and dedicated team, we were able to deliver outstanding performance while making a number of strategic investments to enhance our position in the future. This is an accomplishment the entire Alvarion Team should take pride in," added Mr. Slonimsky.

Q1 2005 Guidance

The Company expects Q1 2005 revenue to range between $57 and $60 million. At this revenue range, net earnings per share are expected to range between breakeven and $0.01, while non-GAAP net earnings per share, which excludes special charges, amortization of intangible assets and deferred stock-based compensation, are expected to range between $0.03 and $0.04.

33.     The press release was materially false and/or misleading because (a) Telmex – whose purchases in 2004 constituted about 30% of Alvarion's revenues – was not planning to make, nor did it discuss with Alvarion, additional orders that would provide any substantial revenue for Alvarion during 2005, and (b) Alvarion could not sustain its growth rate without Telmex's substantial business.

34.     Defendants knew or were deliberately reckless in not knowing (a) that Telmex was not planning to make additional orders, (b) that there was no basis to believe that Telmex – Alvarion's single largest customer by far – would continue to provide substantial revenues in

1   2005, and (c) that Alvarion could not sustain its growth rate without the substantial revenue

2   contribution from Telmex purchases.

3      35.    The market reacted quickly to Alvarion's announcements, as the slowing growth

4   caused by Telmex's lack of purchases continued to materialize. Alvarion stock price dropped

5   11% that day to close at $9.70 per share amid heavy trading.

6      36.    On May 4, 2005, Alvarion issued a press release reporting its financial results for

7   the first quarter of 2005:

8                ALVARION REPORTS FIRST QUARTER 2005 RESULTS

9      o   Broad-based growth continues

10     o   BreezeMAX(TM) continues to dominate WiMAX trials and commercial deployments

11   TEL AVIV, Israel--May 4, 2005 -- Alvarion Ltd. (NASDAQ: ALVR), the leading
provider of wireless broadband solutions worldwide, today announced financial
results for the first quarter ended March 31, 2005.

12

13   On a GAAP basis, revenue for the first quarter reached a record of $57.2
million, up 2% sequentially from $55.9 million and up 28% from $44.7 million in
the first quarter of 2004. Net income was $0.4 million, or $0.01 per share for

14   the quarter, compared with a net loss of $6.8 million or $0.12 cents loss per
share in the fourth quarter of 2004 and net income of $1.4 million, or $0.02 per

15   share in the first quarter of 2004. First quarter results included $0.9 million
acquisition-related expenses pertaining to the purchase of interWAVE

16   Communications on December 9, 2004, as well as $1.1 million of amortization of
intangibles and $0.5 million amortization of deferred stock compensation.

17   Management indicated that any additional acquisition-related charge in Q2 will
be minimal.

18

19   Excluding amortizations and acquisition-related charges, on a non-GAAP basis,
net income was $2.8 million, or $0.04 per share compared with $5.4 million, or
$0.08 per share in the prior quarter and $2.1 million, or $0.03 per share in Q1

20   of 2004.

21   Gross margin increased to 46% as a result of favorable product mix. Excluding
amortizations and acquisition-related expenses mentioned above, operating

22   expenses increased to $24.2 million or 42% of revenue, on a non- GAAP basis, due
primarily to the inclusion of interWAVE Communications' operating expenses for a full

23   quarter.

24   Comments of Management

25   "Our team executed very well this quarter on all major objectives - financial,
technical, and market development," said Zvi Slonimsky, CEO of Alvarion. "We are

26   meeting our targets and continue to expect revenue growth of at least 25% this
year.

27

28   "Demand is strong for both WiMAX and non-WiMAX solutions, and growth in Q1 was
broad-based, coming from products for both licensed and license-exempt

frequencies. Europe was a particular source of strength again this quarter as a result of increasing demand from independent operators using the 5.4 GHz licensed-exempt band that recently became available throughout Europe. These operators are moving aggressively to fill the holes in DSL coverage and, in turn, are prompting the Tier 1 operators to begin moving as well.

"The integration of interWAVE's business is progressing according to plan, and we are beginning to expand our pipeline of new opportunities. Based on this we continue to believe that, once we move through the normal sales cycles for this business, we will begin to see more traction during the second half of the year.

"We recently celebrated another important milestone in the widespread adoption of the WiMAX standard when Intel officially launched their Intel PRO/Wireless 5116 chip. Alvarion is the first company to offer a live demonstration of a working CPE, based on the Intel chip, connected to a live operator's network. This important event took place during the last WiMAX summit in Malaga and is an indication of our time-to-market advantage.

"It was certainly gratifying that most of the operators that participated in the Intel launch event, including Altitude, Iberbanda, and Millicom, are Alvarion customers. Evaluation and trial deployment activity remains brisk, with Alvarion involved in most of the active trials around the world. The scope and duration of these trials up to this point reinforces our belief that our growth will accelerate in the second half of the year.

"We believe that we stand on the threshold of the WiMAX revolution in fixed broadband access, and we look forward to continuing to lead the market for mobile WiMAX through our collaboration with several major partners. We see a bright future for both fixed and mobile applications of this technology," concluded Mr. Slonimsky.

Guidance
--------

The Company's revenue guidance for Q2 2005 is $53 million to $58 million. This guidance assumes no substantial contribution from additional orders related to a major customer's ongoing project due to the difficulty in predicting the precise timing of orders.

At the revenue range above, net earnings per share are expected to range between breakeven and 3 cents while non-GAAP net earnings per share, which excludes amortization of intangibles and acquisition-related charges, is expected to range between 2 and 5 cents.

37.    The press release was materially false and/or misleading because (a) Telmex – whose purchases in 2004 constituted about 30% of Alvarion's revenues – was not planning to make, nor did it discuss with Alvarion, additional orders that would provide any substantial revenue for Alvarion during 2005, and (b) Alvarion could not sustain its growth rate without Telmex's substantial business.

38.     Defendants knew or were deliberately reckless in not knowing (a) that Telmex was not planning to make additional orders, (b) that there was no basis to believe that Telmex – Alvarion's single largest customer by far – would continue to provide substantial revenues in 2005, and (c) that Alvarion could not sustain its growth rate without the substantial revenue contribution from Telmex purchases.

39.     The market reacted quickly to Alvarion's announcements, as the slowing growth caused by Telmex's lack of purchases continued to materialize.  Alvarion stock price dropped that day to close at $8.37 per share.

40.     On July 5, 2005, Alvarion issued a press release reporting announcing preliminary second quarter 2005 financial results:

> Alvarion Announces Preliminary Second Quarter Results;
> Revenue Expected to be $46 to $47 Million
>
> Revised revenue range relates to project delays and
> slower-than-expected pace of some installations
>
> TEL-AVIV, Israel - July 5, 2005 -- Alvarion Ltd. (Nasdaq: ALVR), the world's leading provider of wireless broadband solutions and specialized mobile networks indicated that, when results for the second quarter are announced on August 3rd, revenue is expected to be between $46 and $47 million. The Company indicated that, at this revenue range, EPS for the quarter is expected to be a loss per basic share of $0.06 to $0.08 on a GAAP basis, and a loss per basic share of $0.04 to $0.06 on a non-GAAP basis, which excludes amortization of intangibles and of deferred stock-based compensation, and non-recurring charges, totaling about $1 million.
>
> The shortfall was caused by unrelated customer-specific issues in non-WiMAX areas:
> o    Delays in a few projects as a result of customers' internal reasons such as budget adjustments
> o    Slower-than-expected installations, mainly of certain compact cellular projects, which did not allow us to recognize the revenue from equipment already shipped.
>
> Management's original Q2 guidance already took into account both some minor disruption from the transition to WiMAX and the probability that its largest customer in 2004 would account for a very low amount of Q2 revenue compared to its revenue contribution in the past several quarters.
>
> "It became clear that these customer-specific delays would affect our Q2 revenue in the final days of the quarter," said Zvi Slonimsky, CEO of Alvarion.
> "Interest in WiMAX continues to gain momentum and, although it was a relatively small portion of the total, revenue from our BreezeMAX(TM) product was in line with our plan in Q2."

1    "We continue to expect the second half of 2005 to be better than the first half.
2    In light of the Q2 shortfall, we will have to re-evaluate the achievability of
     our target for the year, and we will give guidance for Q3 and update the overall
3    outlook on August 3, after we have had an opportunity to go through our normal
     quarterly analysis process," concluded Mr. Slonimsky.

4         41.    The press release was materially false and/or misleading because (a) Telmex –

5    whose purchases in 2004 constituted about 30% of Alvarion's revenues – was not planning to

6    make, nor did it discuss with Alvarion, additional orders that would provide any substantial

7    revenue for Alvarion during 2005, and (b) Alvarion could not sustain its growth rate without

8    Telmex's substantial business.

9         42.    Defendants knew or were deliberately reckless in not knowing (a) that Telmex

10   was not planning to make additional orders, (b) that there was no basis to believe that Telmex –

11   Alvarion's single largest customer by far – would continue to provide substantial revenues in

12   2005, and (c) that Alvarion could not sustain its growth rate without the substantial revenue

13   contribution from Telmex purchases.

14        43.    The market reacted quickly to Alvarion's announcements, as the slowing growth

15   caused by Telmex's lack of purchases continued to materialize.  Alvarion stock price dropped

16   22.5% that day to close at $8.88 per share amid heavy trading.

17        44.    On August 3, 2005, Alvarion issued a press release reporting its financial results

18   for the second quarter of 2005:

19   Alvarion Reports Second Quarter 2005 Results
     Final Results Confirm WiMAX Momentum
20
21   TEL AVIV, Israel—August 3, 2005 -- Alvarion Ltd. (NASDAQ: ALVR), the leading
     provider of wireless broadband solutions worldwide, today announced financial results
     for the second quarter ended June 30, 2005.
22
23   Revenue for the second quarter reached $47.0 million, down 18% sequentially from $57.2
     million in the first quarter of 2005, and down 4% from $48.8 million in the second
     quarter of 2004. The decline in revenue resulted from lower sales to a major customer,
24   and delayed orders and postponed revenue recognition in non-WiMAX product lines. On
     a GAAP basis, the lower-than-expected level of revenue caused the company to report a
25   net loss of ($3.6) million, or ($0.06) per share. This compares with net income of $0.4
     million, or $0.01 per share in Q1 and $2.5 million, or $0.04 per diluted share in the
26   second quarter of 2004.

27   Excluding amortization of acquired intangibles and deferred stock compensation of an
     aggregate of $1.1 million and $0.7 million in the second quarter of 2005 and 2004,
28   respectively, and amortization of intangibles and deferred stock compensation as well as

acquisition related expenses totaling $2.5 million in Q1 2005, on a non-GAAP basis, Q2 net loss was ($2.5) million, or ($0.04) per share, compared with a net profit of $2.8 million, or $0.04 per diluted share in the prior quarter, and a non GAAP net profit of $3.2 million, or $0.05 per diluted share in Q2 of 2004. See attached table showing the reconciliation of GAAP to non-GAAP figures.

Gross margin increased to a record 46.5% in Q2 of 2005 due to a favorable product mix. Excluding amortizations mentioned above, operating expenses increased slightly to $25.0 million or 53% of revenue, on a non- GAAP basis, due primarily to continued investment, mainly in research and development in connection with the cellular mobile and WiMAX initiatives.

Comments of Management

"Despite a challenging quarter, BreezeMAX revenue continued to grow in line with our original expectations and we achieved several important goals," said Zvi Slonimsky, CEO of Alvarion. "We continued to expand the number of WiMAX trials and evaluations and believe we are engaged in more WiMAX activity than any other vendor. In addition to expanded trials, in Q2 we began to see additional orders for commercial deployments of the BreezeMAX platform in several regions of the world. This is significant beyond the immediate contribution to revenue because these deployments will afford us valuable field experience that will help us maintain our market lead."

"We are on track with a number of new product introductions. In April, Alvarion was the first vendor to demonstrate a working outdoor CPE based on the Intel chip. Later in the quarter, we also demonstrated our indoor self-install CPE, also based on the Intel chip, at several industry events. We also announced the expansion of the BreezeMAX platform to include 2.3 GHz and 2.5 GHz bands for North America. In addition, we introduced enhancements to some of our non-WiMAX products including the MPOTS extension of our multi-service solution, significantly improving the price per line for carriers."

"The integration of the interWAVE business is progressing according to plan, and we are continuing to expand our pipeline of new opportunities. As these opportunities move through the normal sales cycle, we expect to see better traction and higher revenues during the second half of the year for this business."

Commenting on the quarter, Mr. Slonimsky said, "We have always expected a relatively slow first half of 2005, due to the transition of our wireless DSL products to a WiMAX standard-based platform. Our original guidance, particularly for Q2, assumed some displacement of proprietary products and longer sales cycles as customers considered moving to BreezeMAX. After a detailed analysis of actual Q2 results, we confirmed that the reasons for the revenue delays in our non-WiMAX products were indeed customer-specific, but we also identified an underlying hesitation on the part of customers for our TDM voice-oriented products. This was something we had not anticipated."

"Looking ahead to the second half of the year," Slonimsky continued, "We continue to expect growth from our wireless DSL solutions, both our current advanced products for the unlicensed bands and WiMAX-ready products in the licensed bands. However, our revised outlook assumes that this growth will be less robust than we originally expected due to longer-than-expected sales cycles and potential further delays in allocating licensed spectrum in certain key regions. Our second half expectations are also tempered by the likely continuation of weakness in TDM voice-oriented solutions as customers evaluate potential WiMAX alternatives. We continue to expect improving business momentum in our cellular mobile business in the second half of the year but, as was the case in Q2, we may not recognize revenue in the same quarter as we ship the equipment. Finally, for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

some of the same reasons just cited, we have excluded from our guidance any substantial revenue from a major customer that accounted for a significant amount of our revenue in 2004. We continue to believe that there is a good possibility of further orders from this customer in the second half and, therefore, we believe there is some potential upside to our revised outlook."

Third Quarter Guidance

The Company's revenue guidance for Q3 2005 is $43 million to $48 million. At this revenue range, per share results are expected to range between a loss of 6 and 10 cents per share, while the non-GAAP loss per share, which excludes amortization of intangibles and deferred stock compensation, is expected to range between 4 and 8 cents.

45.    The market reacted quickly to Alvarion's announcements, as the slowing growth caused by Telmex's lack of purchases continued to materialize into Alvarion's downward adjustment of the growth forecast from 25% to **zero or negative growth**.  The market assimilated the **zero or negative growth** due to lack of Telmex purchases.  Alvarion stock price dropped 13.4% that day to close at $8.21 per share amid heavy trading.

46.    On May 12, 2006, Alvarion issued its Form 20-F for 2005 confirming that the cause of Alvarion's declining growth rate was the lack of purchases from its sole substantial customer Telmex:

Sales. Sales in 2005 were approximately $195.7 million, a decrease of approximately 2.9% compared with sales of approximately $201.5 million in 2004. In 2005,  we experienced delays in sales of our non-WiMAX products due to the market transition to WiMAX certified products.

Wireless broadband sales in 2005 were approximately $176.9 million, a decrease of approximately 11.5% compared with sales of approximately $199.9 million in 2004. **In 2004 and 2005, 30.6% and 5.2% of our sales were to a Latin American operator, respectively. For 2005, sales to our Latin American customer decreased significantly due to the nearing completion of a large project. Partly as a result, our revenue decreased in 2005.** Excluding the impact of the large customer, wireless broadband sales increased approximately 20% in 2005 compared with 2004, reflecting broad-based demand for wireless broadband solutions, including the BreezeMAX product, our WiMAX based platform. Sales in Europe, Middle East and Africa reached 58% of our BWA sales in 2005 reflecting an increase of 30% over 2004 sales in this region, · attributed mainly to the progress in the spectrum allocation process and the early adoption of our broadband wireless products by well-capitalized independent operators. **Sales in Central and Latin America accounted for 19% of our BWA sales in 2005 a decrease of 58% (in dollar value) over 2004 in this region, related mainly to the decrease in deployment of a single large customer.** During 2003 we received a large order from a Latin American customer. Initial deployment of this order began in 2003 and the majority was deployed during 2004, with the remainder in 2005. Toward the end of 2005 we received a small additional order from this customer, to be deployed in 2006. (Emphasis added.)

47.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

48.    During the Class Period, Plaintiff and the Class Purchased or otherwise acquired Alvarion securities at artificially inflated prices and were damaged when the concealed truth emerged and caused the drops in Alvarion stock price. The price of Alvarions' common stock declined when the misrepresentations to the market and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thereby causing investors' losses.

## NO SAFE HARBOR

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking" statements when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive of Alvarion who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Alvarion publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are Defendants, directors and officers of Alvarion, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

52.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act as complained herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether the Exchange Act was violated by Defendants;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

d.    Whether Defendants knew or recklessly disregarded that their statements were false and/or misleading.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER
### AGAINST ALL DEFENDANTS

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Alvarion securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them took the actions set forth herein.

58.     Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alvarion securities in violation of Section 10(b) of the Exchange and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the business, operations and future prospects of Alvarion as specified herein.

60.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alvarion's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Alvarion and its business operations

1 and future prospects in the light of the circumstances under which they were made, not

2 misleading, as set forth more particularly herein, and engaged in transactions, practices and a

3 course of business which operated as a fraud and deceit upon the purchasers of Alvarion

4 securities during the Class Period.

5      61.    Each of the Individual Defendants' primary liability, and controlling person

6 liability, arises from the following facts: (i) the Individual Defendants were high-level executives

7 and/or directors at the Company during the Class Period and members of the Company's

8 management team or had control thereof; (ii) each of these defendants, by virtue of his

9 responsibilities and activities as a senior officer and/or director of the Company was privy to and

10 participated in the creation, development and reporting of the Company's internal budgets, plans,

11 projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

12 familiarity with the other defendants and was advised of and had access to other members of the

13 Company's management team, internal reports and other data and information about the

14 Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

15 was aware of the Company's dissemination of information to the investing public which they

16 knew or recklessly disregarded was materially false and misleading.

17      62.    The defendants had actual knowledge of the misrepresentations and omissions of

18 material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

19 ascertain and to disclose such facts, even though such facts were available to them. Such

20 defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

21 for the purpose and effect of concealing Alvarion's operating condition and future business

22 prospects from the investing public and supporting the artificially inflated price of its securities.

23 As demonstrated by defendants' overstatements and misstatements of the Company's business,

24 operations and earnings throughout the Class Period, defendants, if they did not have actual

25 knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

26 such knowledge by deliberately refraining from taking those steps necessary to discover whether

27 those statements were false or misleading.

28

63.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Alvarion's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Alvarion's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Alvarion securities during the Class Period at artificially high prices and were damaged thereby.

64.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Alvarion was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Alvarion securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

66.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### LIABILITY PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST ALL DEFENDANTS

67.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.    The Individual Defendants acted as controlling persons of Alvarion within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   positions, and their ownership and contractual rights, participation in and/or awareness of the

2   Company's operations and/or intimate knowledge of the false financial statements filed by the

3   Company with the SEC and disseminated to the investing public, the Individual Defendants had

4   the power to influence and control and did influence and control, directly or indirectly, the

5   decision-making of the Company, including the content and dissemination of the various

6   statements which plaintiff contends are false and misleading. The Individual Defendants were

7   provided with or had unlimited access to copies of the Company's reports, press releases, public

8   filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after

9   these statements were issued and had the ability to prevent the issuance of the statements or

10  cause the statements to be corrected.

11       69.    In particular, the Individual Defendants had direct and supervisory involvement in

12  the day-to-day operations of the Company and, therefore, is presumed to have had the power to

13  control or influence the particular transactions giving rise to the securities violations as alleged

14  herein, and exercised the same.

15       70.    As set forth above, Alvarion and the Individual Defendants each violated Section

16  10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

17  positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

18  the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff

19  and other members of the Class suffered damages in connection with their purchases of the

20  Company's securities during the Class Period.

21                              **PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiff prays for relief and judgment, as follows:

23       1.     Determining that this action is a proper class action, designating Plaintiff as Lead

24  Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of

25  Civil Procedure and Plaintiff's counsel as Lead Counsel;

26       2.     Awarding compensatory damages in favor of Plaintiff and the other Class

27  members against all defendants, jointly and severally, for all damages sustained as a result of

28  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1      3.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

2  this action, including counsel fees and expert fees; and

3      4.    Such other and further relief as the Court may deem just and proper.

4  **JURY TRIAL DEMAND**

5      Plaintiff hereby demands a trial for jury.

6                     Respectfully submitted,

7  Dated: January 18, 2007         GLANCY BINKOW & GOLDBERG LLP

8                     By: _____

9                        Lionel Z. Glancy
                      Andy Sohrn

10                    1801 Avenue of the Stars, Suite 311

11                    Los Angeles, California 90067
                  Telephone:    (310) 201-9150

12                    Facsimile:    (310) 201-9160

13                    LAW OFFICES OF JACOB SABO
                  Jacob Sabo

14                    The Tower No.3 Daniel Frisch St. 15th Floor
                  Tel Aviv, Israel 64731

15                    Telephone:    011 972 3 607 88 88
                  Facsimile:    011 972 3 607 88 89

16                    **Attorneys for Plaintiff**

17

18

19

20

21

22

23

24

25

26

27

28

---