# Exhibit C



SCOTT + SCOTT LLP
Arthur L. Shingler III (181719)
600 B Street, Suite 1500
San Diego, CA 92101
Tel.: 619/233-4565
Fax: 619/233-0508
Email: ashingler@scott-scott.com

SCOTT + SCOTT LLP
David R. Scott
108 Norwich Avenue
P. O Box 192
Colchester, CT 06415
Tel: 860/537-5537
Fax: 860/537-4432
Email: drscott@scott-scott.com

*Counsel for Plaintiff*

**FILED**

FEB - 2 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

**JSW**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**C 07    0719**

| | |
|---|---|
| MANFRED HACKER, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALVARION LTD., ZVI SLONIMSKY, DAFNA GRUBER AND MEIR BAREL,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

1   Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's

2   undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon

3   personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all

4   other matters, based on, *inter alia*, the investigation conducted by and through plaintiff's attorneys,

5   which included, amongst other things, a review of the defendants' press releases, Securities and

6   Exchange Commission ("SEC") filings by Alvarion Ltd. ("ALVR" or the "Company") and its

7   related entities (collectively "Defendants"), as well as media reports about the Defendants. Plaintiff

8   believes that substantial evidentiary support will exist for the allegations set forth herein after a

9   reasonable opportunity for discovery.

10

11  ## NATURE OF THE CASE

12  1.      This is a federal class action arising out of Defendants' failure to disclose a deceitful

13  and unlawful course of conduct in which they engaged that was designed to improperly enrich

14  Defendants to the detriment of Plaintiffs and the other members of the class. This claim is brought

15  by Plaintiffs against Defendants on behalf of a Class (defined infra) consisting of all persons or

16  entities who purchased Alvarion common stock from November 3, 2004 and through May 12, 2006,

17  inclusive (the "Class Period").

18  2.      Immediately prior to the beginning of the Class Period, Defendants represented that

19  its 2004 contract orders from one of its Latin American customers accounted for as much as 30% of

20  Alvarion's total revenues. However, by the beginning of the Class Period, the Company disclosed to

21  investors that its strong revenue position continued unabated, while in active concealment of the fact

22  that its revenue opportunity with its Latin American customer had deteriorated, along with any hope

23  that the Company was on track to achieve its revenue and income numbers.

24  3.      Unbeknownst to investors, the Defendants had falsely portrayed positive business

25  prospects at Alvarion's outlook as robust, serving to artificially inflate the price of the Company's

26  stock. Defendants took advantage of this inflation, to sell their personal holdings of Alvarion stock at

27

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                                          - 1 -
    FEDERAL SECURITIES LAWS

1  inflated prices, while aware or in conscious and reckless disregard of the truth about the loss of its

2  most significant source of revenues.

3    4.    Defendants' scheme began to unravel when, on February 8, 2006, the Company

4  announced the decline of its revenue opportunities for its 2005 fiscal year. Following this, on May

5  12, 2005, Defendants finally issued their annual report, which demonstrated the lack of purchases in

6  2005 from its Latin American customer. As a result, the price of Alvarion shares declined dramatic

7  decline, closing at $7.92 on May 12, 2005, down as much as 44% from its Class Period high of

8  $14.22 per share on November 3, 2004.

9                          **JURISDICTION AND VENUE**

10    5.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934, §22 of the

11  Securities Act of 1933 and U.S.C. §§1331, 1337 and 1367(a) of the Exchange Act, 27 of the

12  Exchange Act.

13    6.    Venue is proper in this District pursuant to §27 of the 1934 Act.  The Company's

14  North American corporate headquarters are located in this District.

15    7.    In connection with the acts and conduct alleged herein, defendants, directly and

16  indirectly, used the means and instrumentalities of interstate commerce, including the United States

17  mails and the facilities of the national securities exchanges.

18                                 **PARTIES**

19    8.    Plaintiff Manfred Hacker, as set forth in the accompanying certification (attached as

20  Exhibit A) purchased shares of Alvarion during the Class Period and was damaged thereby.

21    9.    Defendant Alvarion Ltd. ("ALVR" or "the Company) engages in the design,

22  development, manufacture, and marketing of wireless products worldwide. It offers WiMAX and

23  other wireless broadband solutions, as well as compact cellular networks to carriers, Internet service

24  providers, and private network operators primarily in developing countries and remote areas. The

25  North American corporate offices of the Company are located at 2495 Leghorn Street, Mountain

26  View, California 94043.

27

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                                    - 2 -
    FEDERAL SECURITIES LAWS

1    10.    Defendant Zvi Slonimsky ("Slonimsky") was, at all relevant times, Chief Executive

2 Officer ("CEO") and a member of the Board of Directors of Alvarion. During the Class Period, and

3 in his role CEO, Slonimsky reviewed and signed Alvarion's filings the SEC.

4    11.    Defendant Dafna Gruber ("Gruber") was, at all relevant times, Chief Financial

5 Officer ("CFO") of Alvarion. During the Class Period, and in her role CFO, Gruber reviewed and

6 signed Alvarion's filings the SEC.

7    12.    Defendant Meir Barel ("Barel") was, at all relevant times, Vice Chairman of the

8 Board of Directors of Alvarion.

9    13.    The individuals named as defendants in ¶¶10-12 are referred to herein as the

10 "Individual Defendants." The Individual Defendants, because of their positions with the Company,

11 possessed the power and authority to control the contents of Alvarion quarterly reports, press

12 releases and presentations to securities analysts, money and portfolio managers and institutional

13 investors, i.e., the market. Each defendant was provided with copies of the Company's reports and

14 press releases alleged herein to be misleading prior to or shortly after their issuance and had the

15 ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

16 positions and access to material non-public information available to them but not to the public, each

17 of these defendants knew that the adverse facts specified herein had not been disclosed to and were

18 being concealed from the public and that the positive representations which were being made were

19 then materially false and misleading.  The Individual Defendants are liable for the false statements

20 pleaded herein, as those statements were each "group-published" information, the result of the

21 collective actions of the Individual Defendants.

22    **SCIENTER**

23    14.    In addition to the above-described involvement, each Individual Defendant had

24 knowledge of Alvarion' problems. Each defendant was motivated to conceal such problems.

25 Defendant Slonimsky as CEO, provided for financial reporting and communications with the market.

26 Communications with the market, including conference calls, as well as internal reports detailing

27 Alvarion' business progress, prospects and actual growth were prepared under their direction.

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                                                              - 3 -

1   Defendant Gruber, as CFO, also provided for communications with the market, including conference

2   calls, as well as reports on Company operations, financing and press releases issued by the

3   Company. Each Individual Defendant sought to demonstrate that he could lead the Company

4   successfully and generate the growth expected by the market. Each Individual Defendant also owed

5   a duty to the Company and its shareholders not to trade on inside information.

6                      **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

7          15.     Each defendant is liable for (a) making false statements, or (b) failing to disclose

8   adverse facts known to him about Alvarion. Defendants' fraudulent scheme and course of business

9   that operated as a fraud or deceit on purchasers of Alvarion publicly traded securities was a success,

10  as it: (a) deceived the investing public regarding Alvarion prospects and business; (b) artificially

11  inflated the prices of Alvarion publicly traded securities; and (c) caused plaintiff and other members

12  of the Class to purchase Alvarion publicly traded securities at inflated prices.

13                     **BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

14         16.     On May 5, 2004, Defendants issued a press release entitled, "Alvarion Reports

15  Record Results for the First Quarter 2004 - Revenues increased 13% sequentially to a record of

16  $44.7 million, improvement in all financial measurements". The press release stated in part:

17         Tel – Aviv, Israel, May 5, 2004 – Alvarion Ltd. (NASDAQ: ALVR), the
        global leader in wireless broadband solutions, today announced financial results for
18      the first quarter ended March 31, 2004.

19         Revenues for the first quarter of 2004 rose to a record $44.7 million, an
        increase of 13% compared to $39.5 million in the fourth quarter of 2003, and up
20      100% from $22.4 million in the first quarter of 2003. Gross margin increased for the
        10th consecutive quarter, reaching 43% compared to 42% in the fourth quarter of
21      2003 and 39 % in the first quarter of 2003.

22                                          ***

23         Comments of Management

24         "Q1 was another quarter of growth with strong execution by our team, which
        enabled us to more than double our profit on a non-GAAP basis from the previous
25      quarter," noted Zvi Slonimsky, CEO of Alvarion. *"Revenues were up 13%
        sequentially even though Q1 tends to be a seasonally weak quarter, owing both to*
26      *strong demand across the board and excellent progress on the implementation of*
        *the large Latin American project for which the company received $40M orders as*
27      *announced last year. The receipt of an $18 million follow-on order for this project*
        *further attests to our performance.*

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                                    - 4 -
    FEDERAL SECURITIES LAWS

***

Q2 2004 Guidance

The Company expects Q2 2004 revenues to range between $47 million and $49 million. At this revenues range, net earnings per share is expected to range between 3 and 4 cents, while non-GAAP net earnings per share, which excludes amortization of intangible assets and deferred stock-based compensation, is expected to range between 4 and 5 cents.

***

17.    On August 4, 2004, Defendants issued yet another press release, attesting to continuing record sales growth into 2Q04. Defendants were well aware that this unprecedented growth was the result of unusually large orders coming from a large Latin American project, sponsored by TelMex, Mexico's main telecommunications service provider. Defendants also knew that the trajectory of the Company's growth was unsustainable, as performance on the existing TelMex contracts was nearing completion and additional contracts of this magnitude had not materialized. Nevertheless, Defendants' communications to the investment community served to artificially inflate the price of the Company's stock, while the Company's revenue opportunities were set decline.

### Defendants False And Misleading Statements

### And Omissions During The Class Period

18.    On November 3, 2004, Defendants issued a press release entitled, "Alvarion Again Achieves Record Results for the Third Quarter of 2004 - Revenues Up 7%, Net Income Increased 47% Sequentially". The press release stated in part:

TEL AVIV, Israel—Nov. 3, 2004–Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced financial results for the third quarter ended September 30, 2004.

Revenues for the third quarter of 2004 rose to a record $52.2 million, an increase of 7% compared to $48.8 million in the second quarter of 2004, and up 52% from $34.3 million in the third quarter of 2003. Gross margin increased for the 12th consecutive quarter, reaching 44.3% compared to 43.2% in the second quarter of 2004 and 41.1% in the third quarter of 2003.

According to US GAAP, net income increased to $3.7 million or $0.06 per share on a fully diluted basis for the third quarter of 2004. GAAP net income for the second quarter of 2004 was $2.5 million, or $0.04 per share on a fully diluted basis,

1    and GAAP net loss for the third quarter of 2003 was $(2.1) million, or $(0.04) per
     share.
2
     Revenues for the first 3 quarters of 2004 totaled to $145.6 million, an
3    increase of 66% compared with revenues of $87.7 million in the same period in
     2003. During the first 3 quarters of 2004, net income totaled to $7.6 million
4    compared to a net loss of $(11.9) million in the same period of 2003.

5    Results for all periods include expenses attributable to the amortization of
     intangible assets and amortization of deferred stock compensation, which totaled
6    $680,000 in the second and third quarters of 2004, and $790,000 in the third quarter
     of 2003. Excluding all aforementioned amortizations, the Company's non-GAAP net
7    income for the third quarter of 2004 was $4.4 million, or $0.07 per diluted share. For
     the second quarter of 2004 non-GAAP net income was $3.2 million, or $0.05 per
8    diluted share, and for the third quarter of 2003 non-GAAP net loss was $(1.3)
     million, or $(0.02) per share.
9
     The Company generated $6.3 million in cash provided by operating activities
10   in the third quarter and the balance sheet remained very strong with its cash position
     reaching a record $170 million at September 30, 2004. DSO was a record low of 35
11   days.

12   Comments of Management

13   "Both technological and market leadership combined with strong execution
     led to another outstanding quarter for the company," said Zvi Slonimsky, CEO of
14   Alvarion. "Once again we achieved improvement in all financial measurements.

15   "We are continuing to enhance our position as the leader in both broadband
     wireless access and the adoption of the WiMAX standard. Our broad-based growth
16   in Q3 again reflected the increase in worldwide demand for wireless broadband
     solutions. We also continue to see a high degree of interest in the WiMAX standard.
17   We were extremely gratified by the outstanding customer response to the
     BreezeMAX 3500, our new WiMAX-ready system. Exemplifying the strong
18   response were two new BreezeMAX customers announced recently – Altitude
     Telecom, an independent operator in France planning a nationwide WiMAX
19   network, and MobileCity, which is deploying the first WiMAX-ready network in
     Scandinavia. During Q3, we received the first sample chips from Intel for the
20   standard CPE. We are pleased with the progress that Intel is making and we are on
     track for having an Intel-based CPE in the market by mid-year 2005.
21
     "During the third quarter, we continued to see strong demand for all product
22   groups from operators around the world. We were pleased by the follow-on orders
     from existing Tier 1 incumbent carriers in Latin America, Europe, South Africa, and
23   China," continued Mr. Slonimsky. "We expect these regions to continue to be
     sources of strong growth going forward. On October 16, 2004, we amended the
24   amalgamation agreement with interWAVE Communications International Ltd., a
     leading supplier of compact cellular network infrastructure based on GSM and
25   CDMA2000 technology that is particularly well-suited for rural areas in developing
     regions. We are currently awaiting approval of the deal by interWAVE shareholders
26   and, once completed, this acquisition will complement our existing wireless solutions
     with a cost effective fixed and mobile solution to serve the need for voice and data in
27   regions of the world that need telecommunication infrastructure. We intend to apply

28   CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
     FEDERAL SECURITIES LAWS                                                    - 6 -

our experience in integrating acquisitions to realize the benefits of the combined company," concluded Mr. Slonimsky.

Q4 2004 Guidance

*The Company expects Q4 2004 revenues to range between $54 million and $56 million. At this revenue range, net earnings per share are expected to range between 7 and 8 cents while non-GAAP net earnings per share, which excludes amortization of intangible assets and deferred stock-based compensation, is expected to range between 8 and 9 cents. The fourth quarter guidance also excludes any impact on results of operations and any one time transaction-related charges associated with the acquisition of interWAVE Communications International Ltd., which the company hopes to close by the end of Q4.*

\*\*\*

19.    On February 16, 2005, Defendants issued a press release entitled, "Alvarion Reports Fourth Quarter and Full Year 2004 Results - Q4 Revenue Set New Record , Non GAAP EPS Excluding Acquisition Impact Exceeded Guidance". The press release stated in part:

TEL AVIV, Israel—February 16, 2005 – Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced financial results for the fourth quarter and year ended December 31, 2004. Both periods include the operating results of interWAVE Communications Ltd (interWAVE) from the date of acquisition, December 9, 2004.

On a GAAP basis, revenue for the fourth quarter was $55.9 million and the net loss was $(6.8) million, or $(0.12) per share. Fourth quarter results included $1.6 million in revenue and an operating loss of $(0.8) million from the inclusion of interWAVE for a 3-week period. GAAP results in the fourth quarter also included special charges of $11.4 million, comprised mainly of the write-off of interWAVE in-process research and development and other acquisition-related expenses.

Strong Fourth Quarter Operating Performance

For comparison purposes, Alvarion's non-GAAP standalone revenue (excluding interWAVE operations) reached a record $54.3 million in the fourth quarter of 2004, an increase of 4% sequentially, and up 38% over the comparable GAAP revenue in the fourth quarter of 2003. Non-GAAP standalone gross margin increased for the 13th consecutive quarter to 44.7%. Non-GAAP standalone EPS exceeded the high end of management's guidance by one cent per share. Excluding amortization of intangible assets and deferred stock compensation, non-GAAP standalone EPS was $0.10 per diluted share, compared with non-GAAP EPS of $0.07 per diluted share in the third quarter of 2004 and non-GAAP EPS of $0.01 per diluted share in the fourth quarter of 2003.

*Commenting on the results, Zvi Slonimsky, CEO of Alvarion, said, "We are pleased to report a strong finish to an excellent year. We grew every quarter during 2004 and ended the year with $200 million in revenue from our traditional business, a 57% increase from the prior year. During 2004, the company generated an impressive $20 million in cash flow from operations and, after acquisition-*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 7 -

1

*related payments, we ended the year with about $133 million in cash on our balance sheet."*

2

3    Summary of Full Year Results

4    On a GAAP basis, revenue for 2004 was $201.5 million, with a net profit of $0.9 million, or $0.01 per diluted share. Full year results included $1.6 million in revenue and an operating loss of $(0.8) million from the inclusion of interWAVE for a 3-week period. GAAP results for 2004 also included special charges of $11.4 million, comprised mainly of the write-off of interWAVE in-process research and development and other acquisition-related expenses.

5

6

7    For comparison purposes, Alvarion's non-GAAP standalone revenue for 2004 was $200 million, compared with GAAP revenue of $127.2 million in 2003. Excluding amortization of intangibles and deferred stock compensation, non-GAAP standalone net profit was $15.9 million, or $0.25 per diluted share, compared with a non-GAAP net loss of $(6.5) million or $(0.12) per share in 2003.

8

9

10    Management Review and Comments

11    "In addition to strong growth, we achieved a number of important business objectives and began multiple strategic initiatives to enhance our future prospects for growth and industry leadership," continued Mr. Slonimsky.

12

13    "During the year, we dramatically increased our direct sales and proved that we can handle large projects for major operators, while also strengthening our relationships with OEM partners and distributors around the globe. Recently, we expanded our existing OEM relationships with Siemens and Alcatel to include our BreezeMAX product and signed a new WiMAX OEM agreement with Lucent as well.

14

15

16

17    "In June, we introduced BreezeMAX 3500, which made us the first vendor to market a WiMAX-ready product. We are gratified by the strong interest in WiMAX from every type of customer, both incumbent and alternative carriers as well as both fixed and mobile operators. We have about 50 installations of our WiMAX-ready solution – either as commercial deployments or in various stages of trial activity. Operators that already have commercial deployments of our WiMAX-ready solutions include, among others, Iberbanda in Spain, Altitude in France and MobileCity in Scandinavia. This points to Alvarion as the vendor of choice for future WiMAX solutions, and we believe that this high level of interest will be converted into revenue mostly beginning in the second half of 2005.

18

19

20

21

22    "We are executing well on our product plans and continue to expect to be introducing an Intel-based WiMAX CPE by mid-year. We plan to expand into the mobile broadband arena next year via two strategic moves. First was the acquisition of the interWAVE cellular mobile business in December. We've added products that support compact GSM and CDMA cellular network deployments and network extensions in hard to reach areas such as rural portion of developing regions, as well as compact cellular networks for specialty applications such as homeland security, disaster relief and travel and leisure. The new CDMA technology complements our existing voice and data capabilities in developing regions. We are pleased that the integration process is moving smoothly and according to our plans.

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 8 -

1    "The second strategic move was the formation of a new business unit to focus on developing a mobile WiMAX solution to be launched next year. The new mobile

2    WiMAX business unit will draw on the technology and experience from both the fixed BWA and cellular businesses to accelerate development.

3

4    "Owing to our strong financial condition and experienced and dedicated team, we were able to deliver outstanding performance while making a number of

5    strategic investments to enhance our position in the future. This is an accomplishment the entire Alvarion Team should take pride in," added Mr.

6    Slonimsky.

7    Q1 2005 Guidance

8    *The Company expects Q1 2005 revenue to range between $57 and $60 million. At this revenue range, net earnings per share are expected to range*

9    *between breakeven and $0.01, while non-GAAP net earnings per share, which excludes special charges, amortization of intangible assets and deferred stock-*

10   *based compensation, are expected to range between $0.03 and $0.04.*

11                                                           ***

12   20.    On May 4, 2005, Defendants issued a press release entitled, "Alvarion Reports First

13   Quarter 2005 Results". The press release stated in part:

14   TEL AVIV, Israel—May 4, 2005 – Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced

15   financial results for the first quarter ended March 31, 2005.

16   On a GAAP basis, revenue for the first quarter reached a record of $57.2 million, up 2% sequentially from $55.9 million and up 28% from $44.7 million in the

17   first quarter of 2004. Net income was $0.4 million, or $0.01 per share for the quarter, compared with a net loss of $6.8 million or $0.12 cents loss per share in the fourth

18   quarter of 2004 and net income of $1.4 million, or $0.02 per share in the first quarter of 2004. First quarter results included $0.9 million acquisition-related expenses

19   pertaining to the purchase of interWAVE Communications on December 9, 2004, as well as $1.1 million of amortization of intangibles and $0.5 million amortization of

20   deferred stock compensation. Management indicated that any additional acquisition-related charge in Q2 will be minimal.

21   Excluding amortizations and acquisition-related charges, on a non-GAAP basis, net income was $2.8 million, or $0.04 per share compared with $5.4 million, or

22   $0.08 per share in the prior quarter and $2.1 million, or $0.03 per share in Q1 of 2004.

23

24   Gross margin increased to 46% as a result of favorable product mix. Excluding amortizations and acquisition-related expenses mentioned above,

25   operating expenses increased to $24.2 million or 42% of revenue, on a non- GAAP basis, due primarily to the inclusion of interWAVE Communications' operating

26   expenses for a full quarter.

27   Comments of Management

28   CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                           - 9 -
     FEDERAL SECURITIES LAWS

"Our team executed very well this quarter on all major objectives - financial, technical, and market development," said Zvi Slonimsky, CEO of Alvarion. "We are meeting our targets and continue to expect revenue growth of at least 25% this year.

"Demand is strong for both WiMAX and non-WiMAX solutions, and growth in Q1 was broad-based, coming from products for both licensed and license-exempt frequencies. Europe was a particular source of strength again this quarter as a result of increasing demand from independent operators using the 5.4 GHz licensed-exempt band that recently became available throughout Europe. These operators are moving aggressively to fill the holes in DSL coverage and, in turn, are prompting the Tier 1 operators to begin moving as well.

"The integration of interWAVE's business is progressing according to plan, and we are beginning to expand our pipeline of new opportunities. Based on this we continue to believe that, once we move through the normal sales cycles for this business, we will begin to see more traction during the second half of the year.

"We recently celebrated another important milestone in the widespread adoption of the WiMAX standard when Intel officially launched their Intel PRO/Wireless 5116 chip. Alvarion is the first company to offer a live demonstration of a working CPE, based on the Intel chip, connected to a live operator's network. This important event took place during the last WiMAX summit in Malaga and is an indication of our time-to-market advantage.

"It was certainly gratifying that most of the operators that participated in the Intel launch event, including Altitude, Iberbanda, and Millicom, are Alvarion customers. Evaluation and trial deployment activity remains brisk, with Alvarion involved in most of the active trials around the world. The scope and duration of these trials up to this point reinforces our belief that our growth will accelerate in the second half of the year.

"We believe that we stand on the threshold of the WiMAX revolution in fixed broadband access, and we look forward to continuing to lead the market for mobile WiMAX through our collaboration with several major partners. We see a bright future for both fixed and mobile applications of this technology," concluded Mr. Slonimsky.

Guidance

The Company's revenue guidance for Q2 2005 is $53 million to $58 million. This guidance assumes no substantial contribution from additional orders related to a major customer's ongoing project due to the difficulty in predicting the precise timing of orders.

At the revenue range above, net earnings per share are expected to range between breakeven and 3 cents while non-GAAP net earnings per share, which excludes amortization of intangibles and acquisition-related charges, is expected to range between 2 and 5 cents.

***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 10 -

21.     On August 3, 2005, Defendants issued a press release entitled, "Alvarion Reports Second Quarter 2005 Results - Final Results Confirm WiMAX Momentum". The press release stated in part:

TEL AVIV, Israel—August 3, 2005 – Alvarion Ltd. (NASDAQ: ALVR), the leading provider of wireless broadband solutions worldwide, today announced financial results for the second quarter ended June 30, 2005.

Revenue for the second quarter reached $47.0 million, down 18% sequentially from $57.2 million in the first quarter of 2005, and down 4% from $48.8 million in the second quarter of 2004. The decline in revenue resulted from lower sales to a major customer, and delayed orders and postponed revenue recognition in non-WiMAX product lines. On a GAAP basis, the lower-than-expected level of revenue caused the company to report a net loss of ($3.6) million, or ($0.06) per share. This compares with net income of $0.4 million, or $0.01 per share in Q1 and $2.5 million, or $0.04 per diluted share in the second quarter of 2004.

Excluding amortization of acquired intangibles and deferred stock compensation of an aggregate of $1.1 million and $0.7 million in the second quarter of 2005 and 2004, respectively, and amortization of intangibles and deferred stock compensation as well as acquisition related expenses totaling $2.5 million in Q1 2005, on a non-GAAP basis, Q2 net loss was ($2.5) million, or ($0.04) per share, compared with a net profit of $2.8 million, or $0.04 per diluted share in the prior quarter, and a non GAAP net profit of $3.2 million, or $0.05 per diluted share in Q2 of 2004. See attached table showing the reconciliation of GAAP to non-GAAP figures.

Gross margin increased to a record 46.5% in Q2 of 2005 due to a favorable product mix. Excluding amortizations mentioned above, operating expenses increased slightly to $25.0 million or 53% of revenue, on a non- GAAP basis, due primarily to continued investment, mainly in research and development in connection with the cellular mobile and WiMAX initiatives.

Comments of Management

"Despite a challenging quarter, BreezeMAX revenue continued to grow in line with our original expectations and we achieved several important goals," said Zvi Slonimsky, CEO of Alvarion. "We continued to expand the number of WiMAX trials and evaluations and believe we are engaged in more WiMAX activity than any other vendor. In addition to expanded trials, in Q2 we began to see additional orders for commercial deployments of the BreezeMAX platform in several regions of the world. This is significant beyond the immediate contribution to revenue because these deployments will afford us valuable field experience that will help us maintain our market lead."

"We are on track with a number of new product introductions. In April, Alvarion was the first vendor to demonstrate a working outdoor CPE based on the Intel chip. Later in the quarter, we also demonstrated our indoor self-install CPE, also based on the Intel chip, at several industry events. We also announced the expansion of the BreezeMAX platform to include 2.3 GHz and 2.5 GHz bands for North America. In addition, we introduced enhancements to some of our non-WiMAX

products including the MPOTS extension of our multi-service solution, significantly improving the price per line for carriers."

*"The integration of the interWAVE business is progressing according to plan, and we are continuing to expand our pipeline of new opportunities. As these opportunities move through the normal sales cycle, we expect to see better traction and higher revenues during the second half of the year for this business."*

Commenting on the quarter, Mr. Slonimsky said, "We have always expected a relatively slow first half of 2005, due to the transition of our wireless DSL products to a WiMAX standard-based platform. Our original guidance, particularly for Q2, assumed some displacement of proprietary products and longer sales cycles as customers considered moving to BreezeMAX. After a detailed analysis of actual Q2 results, we confirmed that the reasons for the revenue delays in our non-WiMAX products were indeed customer-specific, but we also identified an underlying hesitation on the part of customers for our TDM voice-oriented products. This was something we had not anticipated."

"Looking ahead to the second half of the year," Slonimsky continued, "We continue to expect growth from our wireless DSL solutions, both our current advanced products for the unlicensed bands and WiMAX-ready products in the licensed bands. However, our revised outlook assumes that this growth will be less robust than we originally expected due to longer-than-expected sales cycles and potential further delays in allocating licensed spectrum in certain key regions. Our second half expectations are also tempered by the likely continuation of weakness in TDM voice-oriented solutions as customers evaluate potential WiMAX alternatives. We continue to expect improving business momentum in our cellular mobile business in the second half of the year but, as was the case in Q2, we may not recognize revenue in the same quarter as we ship the equipment. Finally, for some of the same reasons just cited, we have excluded from our guidance any substantial revenue from a major customer that accounted for a significant amount of our revenue in 2004. We continue to believe that there is a good possibility of further orders from this customer in the second half and, therefore, we believe there is some potential upside to our revised outlook."

Third Quarter Guidance

*The Company's revenue guidance for Q3 2005 is $43 million to $48 million. At this revenue range, per share results are expected to range between a loss of 6 and 10 cents per share, while the non-GAAP loss per share, which excludes amortization of intangibles and deferred stock compensation, is expected to range between 4 and 8 cents.*

\*\*\*

22.    Defendants' disclosures on November 3, 2004, February 16, 2005, May 4, 2005 and August 3, 2005 were false and misleading because Telmex did not plan to undertake further contracts with the Company, nor was there any reasonable prospect of sustaining the revenue opportunity achieved during 2004 or its growth rate, without relying on its business prospects and opportunities with its Telmex customer. Defendants were aware or consciously and recklessly

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 12 -

1    disregarded these facts, and that it was objectively unreasonable to signal to the investment

2    community positive business prospects, given the reality of the inability of the Company to sustain

3    its growth rate, without any real hope of continued, substantial revenue opportunities from its

4    Telmex customer.

5                                   **THE TRUTH IS REVEALED**

6         23.    On February 8, 2006, defendants issued a shocking press release entitled, "Alvarion

7    Reports Fourth Quarter and Full Year 2005 Results - Resumed sequential growth; BreezeMAX(TM)

8    Leadership Continues". The press release stated in part:

9              TEL AVIV, Israel—February 8, 2006 – Alvarion Ltd. (NASDAQ: ALVR),
              the world's leading provider of wireless broadband solutions and specialized mobile
10            networks, today announced financial results for the fourth quarter and full year ended
              December 31, 2005.

11
              *Revenue for the fourth quarter reached $46.5 million, up 3% sequentially*
12            *from $45.0 million in the third quarter of 2005. Revenue in Q4 2005 declined 17%*
              *from $55.9 million in the fourth quarter of 2004, primarily reflecting a higher*
13            *revenue contribution from one large customer during the fourth quarter of 2004.*

14            Gross margin was 45% in Q4 of 2005, consistent with Alvarion's target
              operating model.
15
              On a GAAP basis, the company reported a net loss of $(4.9) million, or
16            ($0.08) per share. This compares with a net loss of $(5.5) million, or $(0.09) per
              share in Q3 and a net loss of ($6.8) million, or ($0.12) per share in the fourth quarter
17            of 2004, which included charges of $11.4 million representing a write-off of in-
              process research and development and acquisition related expenses.
18
              Excluding amortization of acquired intangibles and deferred stock
19            compensation of an aggregate of $1.1 million in the fourth and third quarters of 2005,
              and $0.8 million in the fourth quarter of 2004 as well as acquisition-related charges
20            of $11.4 million in the fourth quarter of 2004, on a non-GAAP basis, Q4 2005 net
              loss was $)3.8( million, or ($0.06) per share, compared with a net loss of ($4.4)
21            million, or ($0.07) per share in the third quarter of 2005, and a non-GAAP net profit
              of $5.4 million, or $0.08 per diluted share in Q4 of 2004. See the attached table
22            showing the reconciliation of GAAP to non-GAAP figures.

23            *Revenue for 2005 was $195.7 million compared with $201.5 million in*
              *2004. Taking into account a very large deployment by Alvarion's largest customer*
24            *in 2004, revenues from Broadband Wireless Access solutions, including*
              *BreezeMAX, Alvarion's flagship WiMAX platform, increased by 20% in 2005 over*
25            *2004.*

26            On a GAAP basis, the company reported a net loss of ($13.6) million, or
              ($0.23) per share in 2005. This compares with a net income of $0.9 million, or $0.01
27            per share in 2004.

28    CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                                              - 13 -
      FEDERAL SECURITIES LAWS

1

Excluding amortization of acquired intangibles and deferred stock compensation of an aggregate of $4.9 million and $2.8 million in 2005 and 2004, respectively, as well as acquisition-related charges of $0.9 million and $0.4 million in 2005 and 2004, respectively, and $11 million of in-process research and development write-off in 2004, on a non-GAAP basis, 2005 net loss was ($7.8( million, or ($0.13) per share, compared with a net income of $15.1 million, or $0.24 per share in the prior year. See the attached table showing the reconciliation of GAAP to non-GAAP figures.

2

3

4

5

6

Comments of Management

7

8

"We are pleased that we resumed sequential growth in Q4," said Tzvika Friedman, CEO and President of Alvarion. "Broadband wireless access revenue increased for both WiMAX and non-WiMAX based solutions in Q4.

9

"We were particularly gratified by the continued strong performance of our BreezeMAX product, which increased to about $10 million in revenue in Q4. Our fundamental business, primarily wireless DSL solutions, is performing well during the transition to WiMAX and should continue to be the main engine for growth in 2006. We have strengthened our position with some of the carriers we refer to as "innovative challengers" because they are early adopters of new technology, and we expect the overall upward trend to continue.

10

11

12

13

"Other significant developments in Q4 included the successful launch of the largest ever project for our cellular mobile unit, complete networks for the islands of Guadeloupe and Martinique by Outremer Telecom. We believe this will be an important reference account that will help us land more large orders for the cellular mobile unit In addition, a major Latin American customer has placed an initial $7 million order under a new frame agreement that could be worth up to $15 million., covering both BreezeMAX™ and eMGW™ products for several countries in Latin America.

14

15

16

17

18

"The fixed broadband wireless access market – both WiMAX and non-WiMAX – will be an important and growing market for the next several years," continued Mr. Friedman. "We continue to dominate the BWA market where we retain a 30% market share. Our leading position is evidence of our customers' satisfaction with our superior product offering and support.

19

20

21

"We continue to invest in building our company to be a major player in the growing WiMAX market for fixed, nomadic and mobile applications. We are focusing our investment on aggressively expanding our family of WiMAX solutions to include additional frequencies, additional marketing activities with Tier 1 carriers, mobile WiMAX development, affording our customers a smooth migration path to the recently ratified 802.16e standard, and development to enable an array of new services.

22

23

24

25

"While we continue our focus on retaining our leadership in this market, we will also pursue our commitment to realizing the vision of personal broadband to enhance lifestyles and improve productivity with our mobile WiMAX solutions. Moving true broadband from an entirely facilities-based offering to one that is an 'anytime, anywhere' personal offering will create a host of new opportunities in the telecom ecosystem. We are positioning Alvarion to be the partner of choice for

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 14 -

1    operators, both new and incumbent, technology partners, and systems integrators as
2    the market evolves."

3         Q1 Guidance

4         *The Company's revenue guidance for Q1 2006 is $46 million to $51
     million. At this revenue range, non GAAP per share results are expected to range
5    between a loss of 3 and 6 cents per share. This guidance excludes expenses related
     to amortization of acquired intangibles and estimated recurring quarterly stock
6    option expenses resulting from the adoption of SFAS 123R. Also excluded from
     non-GAAP guidance is a one-time positive cumulative effect of a change in
7    accounting principle under SFAS 123R which cannot be quantified at this time.
     Since it is too early to indicate the impact of this one-time positive cumulative
8    effect, the company will not provide GAAP earnings per share guidance.*

                                    ***

9         24.    The shocking news of the Company's brutal 17% revenue decline during 4Q05

10   coupled with declining annualized revenues caused the price of Alvarion stock to fall $0.88 or 8.1%,

11   to close on February 8, 2006 at a price $9.95 per share, on volume of 2.0 million shares.

12        25.    Finally, on May 12, 2006, defendants filed their Annual Report on SEC Form 20-F.

13   The filing dubiously stated in part:

14        Wireless broadband sales in 2005 were approximately $176.9 million, a
15   decrease of approximately 11.5% compared with sales of approximately $199.9
     million in 2004. In 2004 and 2005, 30.6% and 5.2% of our sales were to a Latin
16   American operator, respectively. *For 2005, sales to our Latin American customer
     decreased significantly due to the nearing completion of a large project. Partly as a
17   result, our revenue decreased in 2005.* Excluding the impact of the large customer,
     wireless broadband sales increased approximately 20% in 2005 compared with 2004,
18   reflecting broad-based demand for wireless broadband solutions, including the
     BreezeMAX product, our WiMAX based platform. Sales in Europe, Middle East and
19   Africa reached 58% of our BWA sales in 2005 reflecting an increase of 30% over
     2004 sales in this region, attributed mainly to the progress in the spectrum allocation
20   process and the early adoption of our broadband wireless products by well-
     capitalized independent operators. Sales in Central and Latin America accounted for
21   19% of our BWA sales in 2005 a decrease of 58% (in dollar value) over 2004 in this
     region, related mainly to the decrease in deployment of a single large customer.
22   During 2003 we received a large order from a Latin American customer. Initial
     deployment of this order began in 2003 and the majority was deployed during 2004,
23   with the remainder in 2005. Toward the end of 2005 we received a small additional
     order from this customer, to be deployed in 2006.If we lose large customers we may
24   not succeed in replacing them and our revenues will be adversely affected.

25                                  ***

26        26.    Despite this dubious disclosure, investors had finally learned the truth - that revenue

27   and sales from TelMex, the Latin American operator accounting for 30.6% of the Company's sales

28

1  in 2004, *had already evaporated.* Moreover, despite the fact that the Company sought to actively

2  conceal the evaporation of this substantial source of revenues, *investors were now fully aware that*

3  *these dramatic sales declines were fully reflected in the Company's revenue and income numbers*

4  *for the 2005 fiscal year.*

5        27.    The almost 8.1% decline in Alvarion's stock price occurring during the week of

6  February 8, 2006 was the direct result of the unraveling of the nature and extent of defendants' fraud

7  finally being revealed to investors and the market. The timing and magnitude of Alvarion's stock

8  price declines negate any inference that the loss suffered by plaintiff and other Class members was

9  caused by changed market conditions, macroeconomic or industry factors or Company-specific facts

10  unrelated to the defendants' fraudulent conduct. While the almost 8.1% decline in Alvarion's stock

11  price occurred as defendants' fraud was being revealed, the Standard & Poor's 500 securities index

12  was flat.

13        28.    On May 12, 2006, the end of the Class Period, the price of Alvarion shares was $7.92,

14  off by as much as 44% from its Class Period high of $14.22 per share on November 3, 2004. The

15  economic loss, i.e., damages, suffered by plaintiff and other members of the Class were a direct

16  result of defendants' fraudulent scheme to artificially inflate Alvarion's stock price and the

17  subsequent significant decline in the value of Alvarion's stock when defendants' prior

18  misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## FRAUD-ON-THE-MARKET DOCTRINE

22        29.    At all relevant times, the market for Alvarion was an efficient market, for the

23  following reasons, among others:

24            (a)    Alvarion met the requirements for listing, and was listed and actively traded

25  on the NASDAQ, a highly efficient and automated market;

26            (b)    As a regulated issuer, defendants filed periodic public reports with the SEC;

27  and

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
    FEDERAL SECURITIES LAWS                                         - 16 -

1      (c)      Defendants regularly communicated with public investors via established

2  market communication mechanisms, including through regular disseminations of press releases on

3  the national circuits of major newswire services and through other wide-ranging public disclosures,

4  such as communications with the financial press and other similar reporting services.

5      30.      As a result of the foregoing, the market for the securities of Alvarion promptly

6  digested current information regarding Alvarion from all publicly available sources and reflected

7  such information in stock prices of Alvarion. Under these circumstances, all persons who purchased

8  or acquired the securities of Alvarion during the Class Period suffered similar injury through their

9  purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance

10  applies.

11                          **NO SAFE HARBOR**

12      31.      The statutory safe harbor provided for forward-looking statements under certain

13  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

14  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

15  when made. To the extent there were any forward-looking statements, there were no meaningful

16  cautionary statements identifying important factors that could cause actual results to differ materially

17  from those in the purportedly forward-looking statements. Alternatively, to the extent that the

18  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

19  liable for those false forward-looking statements because at the time each of those forward-looking

20  statements was made, the particular speaker knew that the particular forward-looking statement was

21  false, and/or the forward-looking statement was authorized and/or approved by executive officer(s)

22  of defendants who knew that those statements were false when made.

23                          **CLASS ACTION ALLEGATIONS**

24      32.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

25  of Civil Procedure on behalf of all persons who purchased Alvarion publicly traded securities on the

26  open market during the Class Period (the "Class") and were damaged thereby. Excluded from the

27  Class are defendants.

28  CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE                                    - 17 -
    FEDERAL SECURITIES LAWS

33.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Alvarion had more than 61 million shares of stock outstanding, owned by hundreds if not thousands of persons.

34.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the prices of Alvarion's publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

35.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

36.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

37.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

38.    Plaintiff incorporates ¶¶1-36 by reference, as if fully rewritten herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 18 -

39.   During the Class Period, defendants disseminated, approved or deliberately disregarded the false statements specified above, which they knew or should have known were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

40.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of publicly traded Alvarion publicly traded securities during the Class Period.

41.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Alvarion publicly traded securities. Plaintiff and the Class would not have purchased Alvarion publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

42.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Alvarion publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

43.   Plaintiff incorporates ¶¶1-41 by reference, as if fully rewritten herein.

44.   The Individual Defendants acted as controlling persons of Alvarion within the meaning of §20(a) of the Exchange Act. By reason of their positions as officers and/or directors of Alvarion and their ownership of Alvarion stock, the Individual Defendants had the power and

1    authority to cause Alvarion to engage in the wrongful conduct complained of herein.   Alvarion

2    controlled each of the Individual Defendants and all of its employees.  By reason of such conduct,

3    the Individual Defendants and Alvarion are liable pursuant to §20(a) of the Exchange Act.

4

5                                   **PRAYER FOR RELIEF**

6    WHEREFORE, plaintiff prays for judgment as follows:

7              (a)      Declaring this action to be a proper class action pursuant to FRCP 23;

8              (b)      Awarding plaintiff and the members of the Class damages, interest and costs;

9    and

10             (c)      Awarding such equitable/injunctive or other relief as the Court may deem just

11    and proper.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
      FEDERAL SECURITIES LAWS                                                           - 20 -

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action so triable.

DATED:    February 2, 2007

Respectfully submitted,

SCOTT + SCOTT, LLP
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (610) 233-0508

SCOTT + SCOTT, LLP
David R. Scott
108 Norwich Avenue
P. O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 21 -

**EXHBIT A**

FROM :                          PHONE NO. :                          Feb. 01 2007 03:58PM P1

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Manfred Hackl, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint and retains Scott + Scott, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction(s) in the ALVARION LTD. (ALVR) security that is the subject of this action during the Class Period is/are as follows:

| No of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 2000 | Buy | 1/18/05 | $10.90 |

5.      During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February, 2007, at Sunny Isles FL (city, state).

Your Printed Name:   Manfred Hacker

Signature:

Mailing Address:

REDACTED

Telephone number:

E-mail address: